IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MOUNTAIN WEST HOLDING CO., INC., <br><br> Plaintiff, <br><br> vs. <br><br> THE STATE OF MONTANA; THE MONTANA DEPARTMENT OF TRANSPORTATION; and MR. MIKE TOOLEY, THE DIRECTOR OF THE MONTANA DEPARTMENT OF TRANSPORTATION, <br><br> Defendants. | CV 13–49–BLG–DLC <br><br> ORDER |

Before the Court are the parties' cross-motions for summary judgment. For the reasons explained, the Court grants Defendant's motion for summary judgment on all claims.

**Factual and Procedural Background**

Plaintiff Mountain West Holding Company ("Mountain West") brings the following claims against Defendants State of Montana, Montana Department of Transportation, Mike Tooley, Director of the Montana Department of Transportation, Patti McCubbins, MDT's Civil Rights Bureau Chief, and Wendy

1

Stewart, MDT's DBE Program Manager ("Defendants"): Count 1: Violation of the Fourteenth Amendment and 42 U.S.C. § 1983, for which Mountain West seeks declaratory and injunctive relief against the individual Defendants; Count 2: Declaratory Relief under 28 U.S.C. § 2201 against the individual Defendants; Count 3: Violation of Title VI, 42 U.S.C. § 2000d, for which Mountain West seeks monetary damages against the State of Montana and the Montana Department of Transportation; and Count 4: Injunctive Relief against the individual Defendants. Mountain West alleges Defendants' implementation of Montana's Disadvantaged Business Enterprise ("DBE") program violated, and are likely to continue to violate, its constitutional right to Equal Protection under the Fourteenth Amendment.

1.  **Statutory and Regulatory Background**

Pursuant to the current federal highway funding bill, Moving Ahead for Progress in the 21st Century Act ("MAP-21"), states[1] receiving federal funds from the U.S. Department of Transportation ("USDOT") for the planning, design, construction and repair of roads and highways must establish a state-designed and

---

[1] The regulations refer to "recipients," instead of states, meaning the state agency receiving federal funds. For ease of reference, this order simply refers to "states."

federally-approved DBE program that complies with federal regulations.[2] *See* 49 C.F.R. § 26.1 *et. seq.* DBE programs are designed to ensure nondiscrimination in the award and administration of USDOT funded contracts and to create a level playing field for businesses competing for USDOT funded contracts, among other objectives. 49 C.F.R. § 26.1. A state is not eligible to receive USDOT financial assistance unless it is in compliance with federal regulations and USDOT approves its DBE program. *Id.* at 26.21(c).

A DBE is a small business owned and controlled by socially and economically disadvantaged individuals. MAP-21 §1101(b)(3). States creating DBE programs "must rebuttably presume that citizens of the United States (or lawfully admitted permanent residents) who are women, Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, Subcontinent Asian Americans, or other minorities found to be disadvantaged by the SBA, are socially and economically disadvantaged individuals." 49 C.F.R. § 26.67.

States must establish an "overall goal" for DBE participation in federally assisted contracts. *Id.* at 26.45(a). To do this, the state must determine the base

---

[2] As another condition of accepting federal highway dollars, states must waive Eleventh Amendment sovereign immunity for violations of Title VI, 42 U.S.C. 2002d ("Title VI"). States accepting federal highway dollars are thus subject to liability for monetary damages for violations of Title VI, which prohibits discrimination based on race, color, or national origin.

3

level of availability of DBE's in its jurisdiction, make any necessary adjustments to the base level, and then arrive at an overall goal for DBE utilization, expressed as a percentage of all Federal-aid highway funds the state will expend in the forthcoming three fiscal years. *Id.* at 26.45(c)-(e). Overall goals "must provide for participation by all certified DBEs and must not be subdivided into group-specific goals." *Id.* at 26.45(h). If a state establishes or implements its goals in a way different from that provided in the regulations, then it is ineligible to receive USDOT financial assistance. *Id.* at 26.45(f)(7).

States must use race- and gender-neutral means to meet their overall goals to the maximum extent possible. *Id.* at 26.51(a). In order to meet any portion of the overall goal that the state predicts it cannot achieve using race-neutral means, the state must establish "contract goals," which are contract-specific goals for DBE participation on specific, USDOT-assisted contracts that have subcontracting possibilities. *Id.* at 26.51(d),(e). Contract goals should be set "so that they will cumulatively result in meeting any portion of [a state's] overall goal [that it] does not project being able to meet through the use of race-neutral means." *Id.* at 26.51(e)(2). Contract goals "must provide for participation by all certified DBEs and must not be subdivided into group-specific goals." *Id.* at 26.51(e)(4).

## 2. *Western States Paving Co. v. Washington Dept. of Transportation*

In 2005, a divided three-judge panel of the Ninth Circuit decided *Western States Paving Company v. Washington State Department of Transportation*. 407 F.3d 983 (9th Cir. 2005). In *Western States*, the Court held that a state DBE program can be subject to an as-applied constitutional challenge, despite the facial validity of the federal program.[3] 407 F.3d at 997. The Court held that whether a state DBE program "is narrowly tailored to further Congress's remedial objective depends upon the presence or absence of discrimination in the State's transportation contracting industry." *Id.* at 997-998. The Court further held that "even when discrimination is present within a State, a remedial program is only narrowly tailored if its application is limited to those minority groups that have actually suffered discrimination." *Id.* at 998.[4]

## 3. **Montana's response to *Western States***

Prior to *Western States*, Montana had used race conscious contract goals to meet its annual overall goal for DBE participation. Following *Western States*, the Montana Department of Transportation ceased using race-conscious means in its

---

[3] The panel was in unanimous agreement that the federal statute and regulations were facially valid. 407 F.3d at 1003 (J. McKay concurring in part and dissenting in part).

[4] As noted above, federal regulations generally prohibit subdividing overall goals or contract goals into "group-specific goals." 49 C.F.R. §§ 26.45(h), 26.51(e)(4).

award of USDOT-assisted contracts.

Montana DOT also engaged a private firm, the D. Wilson Consulting Group, LLC, to determine whether there was evidence of discrimination in Montana's transportation contracting market. The D. Wilson Consulting Group ("the Group") studied DBE participation in USDOT-assisted contracts in Montana for fiscal years 2000 through 2006.

The Group published the results of its study ("the D. Wilson Disparity Study," "Disparity Study" or "the study") in 2009. After controlling for a variety of factors, the Group produced an adjusted list of qualified, willing, and able DBEs within the market area for Montana transportation contracts. Based on this adjusted list of DBEs, the Group conducted a disparity analysis by business area to determine the differences between the utilization of DBEs and the availability of such firms within the relevant market area. The results indicated significant underutilization of DBEs in all minority groups in "professional services" contracts, significant underutilization of Asian Pacific Americans and Hispanic Americans in "business categories combined," slight underutilization of nonminority women in "business categories combined," and overutilization of all groups in subcontractor "construction" contracts. (Doc. 54-1 at 27.)

The Group also gathered anecdotal evidence through surveys and other

means. The anecdotal evidence suggested that various forms of discrimination existed within Montana's transportation contracting industry, including evidence of an exclusive "good ole boy network" that made it difficult for DBEs to break into the market. (Doc. 54-1 at 274-76.) Despite these findings, the Group recommended that Montana DOT continue to monitor DBE utilization while employing only race-neutral means to meet its overall goal. The Group recommended that Montana DOT consider the use of race-conscious measures if DBE utilization decreased or did not improve.

Montana followed the recommendations provided in the D. Wilson Study, and continued using only race-neutral means in its effort to accomplish its overall goal for DBE utilization. Based on the statistical analysis provided in the study, Montana established an overall DBE utilization goal of 5.83%.

### 4. Montana's DBE utilization following removal of contract goals

In fiscal year 2006, Montana achieved a DBE utilization rate of 13.1%. However, after Montana ceased using contract goals to achieve its overall goal, the rate of DBE utilization declined sharply. In 2007, DBE utilization dropped to 5%; in 2008, it dropped again to 3%; in 2009, it dropped again to 2.5%; in 2010, it dropped again to .8%; and in 2011, it was 2.8%.

In response to this decline, for fiscal years 2011-2014, Montana DOT

adopted a goal methodology for DBE utilization which employed contract goals in 3.27% of its USDOT contracts, in order to achieve Montana's overall goal of a 5.83% DBE utilization. After receiving USDOT approval for its program, Montana implemented the use of contract goals in June of 2012. It continued to use contract goals until the early part of 2014.

Montana DOT conducted and prepared a new Goal Methodology for DBE utilization for federal fiscal years 2014-2016. USDOT approved of the new and current goal methodology. The current goal methodology does not provide for the use of contract goals to meet the overall goal. Thus, the new overall goal is predicted to be met entirely through the use of race-neutral means. In addition, Montana DOT is currently soliciting contractors to conduct a new disparity study and expects to enter into a contract for completion of a new disparity study by early 2015.

**5.      Mountain West's claims**

Plaintiff Mountain West is a contractor that provides construction-specific traffic planning and staffing for construction projects. It is owned and controlled by white males. It does not qualify for DBE status because, under the regulations,

it is neither socially nor economically disadvantaged.[5]

Mountain West seeks declaratory and injunctive relief, including prospective relief, against the individual Defendants for alleged violations of the Fourteenth Amendment and 42 U.S.C. § 1983. It also seeks monetary damages against the State of Montana and the Montana Department of Transportation for alleged violations of Title VI, 42 U.S.C. § 2000d.

Mountain West's claim for monetary damages under Title VI is rooted in its claim that on three occasions in 2012 it was the low-quoting subcontractor to a prime contractor that was submitting a bid to the Montana DOT on a project that utilized contract goals. Despite being the low-quoting bidder, Mountain West was not awarded the contracts. Mountain West mounts an as-applied challenge to Montana's DBE program.

## 6. The parties' motions

In its Scheduling Order of August 29, 2013, the Court established a fully briefed motions deadline of September 30, 2014. "Fully briefed" is defined in the Scheduling Order and "means that the brief in support of the motion and the

---

[5] Mountain West is not precluded from DBE status on the basis of its owners' race alone. Mountain West is precluded from DBE status due to its income and the income of its shareholders. Indeed, within Montana during fiscal years 2012-2014, there were seven certified DBEs owned by white males.

opposing party's response brief are filed with the court." (Doc. 25 at 7.) Per Local Rules, reply briefs are optional. L.R. 7.1(d)(1)(C).

Mountain West timely filed its motion for partial summary judgment on August 26, 2014. Defendants timely filed their motion for summary judgment on September 9, 2014. Only two other motions were timely filed: Defendants' motion in limine (Doc. 48) filed on September 2, 2014, and Defendants' motion to strike expert report (Doc. 58), filed on September 16, 2014.

Despite the Court's clear fully-briefed motions deadline, the parties have continued to file untimely motions (and responses to the motions) without first seeking leave of court. The list of untimely motions includes: (1) Defendants' motion to strike (Doc. 64), filed September 29, 2014; (2) Plaintiff's motion to strike (Doc. 66), filed September 30, 2014; (3) Plaintiff's motion to strike (Doc. 79), filed October 6, 2014; and (4) Plaintiff's motion to strike (Doc. 89), filed October 20, 2014. All of these late motions are denied as untimely filed.

## Legal Standard

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. A dispute as to a material fact is "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

## Discussion

Race conscious remedial programs must satisfy strict scrutiny. *Western States*, 407 F.3d at 990. To do so, the program must be comprised of "narrowly tailored measures that further a compelling governmental interest." *Id.*[6]

A state implementing the facially valid federal DBE program "need not demonstrate an independent compelling interest for its DBE program" because when Congress passed the relevant legislation it "identified a compelling nationwide interest in remedying discrimination in the transportation contracting industry." *Id.* at 997. Thus, in order to pass strict scrutiny a state need only demonstrate that its program is narrowly tailored. *Id.*

---

[6] Gender-conscious programs must satisfy intermediate scrutiny. *Western States*, 407 F.3d at 990 n. 6. To do so, the program must be "supported by an 'exceedingly persuasive justification' and substantially related to the achievement of that underlying objective." *Id.* Because Montana's DBE program passes strict scrutiny, the Court need not engage in a separate analysis of the program's gender-conscious measures.

Under the two-prong test established in *Western States*, in order to demonstrate that its DBE program is narrowly tailored, (1) the state must establish the presence of discrimination within its transportation contracting industry, and (2) the remedial program must be limited to those minority groups that have actually suffered discrimination. *Associated General Contractors of America, San Diego Chapter v. California Department of Transportation*, 713 F.3d 1187, 1196 (9th Cir. 2013).

States "can meet the evidentiary standard required by *Western States* if, looking at the evidence in its entirety, the data show substantial disparities in utilization of minority firms suggesting that public dollars are being poured into 'a system of racial exclusion practiced by elements of the local construction industry.'" *Id.* at 1197 (quoting *Croson*, 488 U.S. 469, 492 (1989)). Moreover, as the federal guidelines provide, narrow tailoring does not require a state to parse its DBE program to distinguish between certain types of contracts within the transportation contracting industry. *Id.* at 1199 (citing *N. Contracting Inc. v. Illinois*, 473 F.3d 715, 723 (7th Cir. 2007). Likewise, a state DBE program need not require minority firms to attest to the fact that they have been discriminated against in the relevant jurisdiction because such a requirement is contrary to federal regulations and would thus constitute "an impermissible collateral attack

on the facial validity of the federal Act and regulations." *Id.* at 1200 (citing *N. Contracting*, 473 F.3d at 722); *see also Milwaukee County Pavers Ass'n v. Fiedler* 922 F.2d 419, 423-24 (7th Cir. 1991).

Defendants assert that they are entitled to summary judgment on all claims because Montana's DBE program passes strict scrutiny.[7] Defendants contend that Montana's DBE program utilized contract goals only after the Department was presented with both statistical and anecdotal evidence of discrimination against all minorities in its transportation contracting industry. Defendants also contend that Montana DOT only began utilizing contract goals after statistical evidence mounted between 2006 and 2011 suggesting that race-neutral measures were inadequate to address the problem. The Court agrees that Montana's DBE program passes strict scrutiny.

Mountain West cannot create a genuine dispute about the fact that the D. Wilson Study indicated significant underutilization of all minority groups in the award of professional services contracts in Montana's transportation contracting market. Nor can it dispute that the D. Wilson Study indicated significant underutilization of Asian Pacific Americans and Hispanic Americans in the award

---

[7] Defendants raise various other defenses but the Court finds this issue dispositive and so declines to address Defendants' various other arguments.

of contracts in business categories combined in Montana's transportation contracting market. Mountain West cannot dispute that the D. Wilson Study also indicated underutilization of nonminority women in business categories combined. Furthermore, Mountain West cannot dispute that the D. Wilson Study documented, through surveys and otherwise, significant anecdotal evidence of various forms of discrimination in Montana's transportation contracting industry.

Mountain West merely disputes the validity of the findings in the D. Wilson Study. According to Mountain West, the "D. Wilson study is flawed" because the methods the Group used in gathering and calculating statistical and anecdotal evidence of discrimination were flawed. (Doc. 70 at 18.) In mounting this attack on the D. Wilson Study, Mountain West relies entirely on the expert report of one Dr. George Lanoue.[8] Of this 184-page report, Mountain West cites the Court to two pages in the report in which Dr. Lanoue opines that the table showing DBE utilization in business categories combined was improperly calculated.

Mountain West, however, provides no evidence indicating that the data

---

[8] Defendants filed a motion to strike Dr. Lanoue's expert report in which Defendants correctly assert that the report was unauthenticated and unsworn and thus could not be considered on a motion for summary judgment. *See e.g. Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (1987). In response to the motion to strike, however, Mountain West filed an affidavit of Dr. Lanoue which, when liberally construed, minimally satisfies the requirements for authentication. The Court therefore considers the expert report, despite its hesitation to regard the post-hoc filing of the supporting affidavit as sufficient to authenticate the expert report. Defendants motion to strike the expert report is denied.

showing significant underutilization of all minority groups in professional services is invalid. Furthermore, contrary to Mountain West's assertions, the D. Wilson Study controlled for factors other than discrimination in calculating DBE utilization. The D. Wilson Study specifically adjusted its calculation of the availability of DBE firms based on its control for factors other than discrimination. (Doc. 54-1 at 67-69.)

Mountain West's attack on the D. Wilson Study also does not in any way diminish the fact that the D. Wilson Study uncovered substantial anecdotal evidence of discrimination in Montana's transportation contracting market, including evidence of a "good ole boy network." (Doc. 54-1 at 274-276.) In *Associated General Contractors*, the Court noted that "federal courts and regulations have identified precisely [the factors associated with good ole boy networks] as barriers that disadvantage minority firms because of the lingering effects of discrimination." 713 F.3d at 1197-98; *see also H.B. Rowe v. Tippett*, 615 F.3d 233, 251 ("such networks exert a chronic and pernicious influence on the marketplace that calls for remedial action").

Relative to the anecdotal evidence, Dr. Lanoue's report merely criticizes the sample size of the responses obtained. Mountain West also contends that the anecdotal evidence is unreliable because Defendants have not presented affidavits

15

in support of the anecdotal evidence gathered. But, contrary to Mountain West's assertion, nothing in *Western States* requires that anecdotal survey evidence gathered by a private firm assisting a state in preparing its goal methodology for the state's DBE program must be supported by affidavits. Mountain West fails to create a genuine dispute that anecdotal evidence indicates the existence of discrimination in Montana's transportation contracting industry. Ultimately, as the Court held in *Associated General Contractors*, "[t]he substantial statistical disparities alone would give rise to an inference of discrimination, and certainly . . . statistical evidence combined with anecdotal evidence passes constitutional muster." *Associated General Contractors*, 713 F.3d at 1196.

Additionally, neither Dr. Lanoue's report nor any other evidence presented by Mountain West, creates a genuine dispute about the fact that DBE utilization in Montana's transportation contracting industry dropped precipitously after 2006 when Montana ceased using contract goals. While the D. Wilson Study indicated that Montana should utilize DBEs at a rate of 5.83%, by 2010, DBE utilization in Montana had fallen dramatically to .8%. This undisputed fact "strongly supports [Defendants'] claim that there are significant barriers to minority competition in the public subcontracting market, raising the specter of racial discrimination." *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1174 (10th Cir. 2000).

In sum, Defendants have presented sufficient evidence to demonstrate evidence of discrimination in Montana's transportation contracting industry. Moreover, based on the facts that (1) statistical evidence suggests that all minority groups in professional services are significantly underutilized, (2) there is evidence of an exclusive "good ole boy network" within the state contracting industry, and (3) DBE underutilization dramatically increased after 2006 when the state ceased using contract goals, the Court concludes that Montana's DBE program is sufficiently narrowly tailored to address discrimination against only those groups that have actually suffered discrimination in the state's transportation contracting industry.[9]

Montana's DBE program survives strict scrutiny by (1) having a strong basis in evidence of discrimination within Montana's transportation contracting industry and (2) being narrowly tailored to benefit only those groups that have actually suffered discrimination. Therefore, Defendant's implementation of its DBE program did not violate Defendant's constitutional rights under the Fourteenth Amendment, nor did it violate 42 U.S.C. § 1983, or Title VI.

---

[9] The Court notes, furthermore, that federal regulations generally prohibit a state from subdividing either its overall goal or contract goals into "group-specific goals." 49 C.F.R. §§ 26.45(h), 26.51(e)(4). Thus, Mountain West's claim in this respect appears to be an impermissible collateral attack on the facially valid federal Act and regulations. *See Associated General Contractors*, 713 F.3d at 1200 (citing *N. Contracting*, 473 F.3d at 722).

Mountain West fails to create a genuine dispute relative to its claims regarding Montana's DBE program during 2012-2014 when Defendants utilized contract goals. It follows that Mountain West's claims for prospective, injunctive and declaratory relief also fail because Montana has currently ceased using contract goals and any potential future utilization of contract goals will be based on a not-yet conducted disparity study. Defendants are entitled to summary judgment on all claims.

IT IS ORDERED that:

(1) Defendants' motion for summary judgment (Doc. 50) is GRANTED.

(2) Plaintiff's motion for summary judgment (Doc. 44) is DENIED.

(3) Defendants' motions to strike (Docs. 58 & 64) are DENIED.

(4) Plaintiff's motions to strike (Docs. 66, 79, & 89) are DENIED.

(5) Defendants' motion in limine (Doc. 48) is DENIED AS MOOT.

(5) The Clerk of Court shall enter judgment in favor of Defendants and against Plaintiff.

(6) This case is CLOSED.

DATED this 26th day of November 2014.

Dana L. Christensen, Chief District Judge
United States District Court