DAVID L. OHLER
VALERIE D. WILSON
Special Assistant Attorneys General
Montana Department of Transportation
P.O. Box 201001
Helena, MT 59620-1001
(406) 444-6094
(406) 444-6065
Email: dohler@mt.gov; valwilson@mt.gov

ATTORNEYS FOR DEFENDANTS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

_____

| | | |
|---|---|---|
| MOUNTAN WEST HOLDING CO., INC., | ) ) ) | Cause No. CV-13-49-BLG |
| Plaintiff, | ) ) | DEFENDANTS' PROPOSED FINDINGS OF FACT |
| v. | ) ) | AND CONCLUSIONS OF LAW |
| STATE OF MONTANA; DEPATMENT OF TRANSPORTATION, | ) ) ) ) | |
| Defendants. | ) ) | |

_____

Defendants submit their Proposed Findings of Fact and Conclusions of Law.

# FINDINGS OF FACT

<u>Introduction</u>

1. Plaintiff Mountain West Holding Company (Mountain West or MWHC) is a Montana corporation that performs highway-related construction work. *Amended Complaint, p. 2.*

2. Mountain West Holding Company is owned and controlled by white males: Chris Connors, Keith Johnston and Kevin Kitchin.  Each holds one third (1/3) of the outstanding stock of the corporation.  *Amended Complaint; Stipulation of Net Worth.*

3. Chris Connors, Keith Johnston and Kevin Kitchin are not economically disadvantaged as defined in Title 49  C.F.R., Part 26.  *Stipulation of Net Worth.*

4. Chris Connors, Keith Johnston and Kevin Kitchin are not socially disadvantaged as defined in Title 49  C.F.R., Part 26.  *Stipulation of Net Worth.*

5. Mountain West Holding Company is not and has not been a Disadvantaged Business Enterprise (DBE).  Mountain West Holding Company does not meet the criteria to be certified as a DBE pursuant to Title 49 C.F.R. Part 26. *Amended Complaint, p. 4; Stipulation of Net Worth;  Plaintiff's Response to Defendants' Third Discovery Requests, Request for Admission No. 5.*

6. Mountain West Holding Company does not claim in these proceedings that it has been or is qualified to become a DBE. *Stipulation of Net Worth.*

7. Mountain West Holding Company does not claim in these proceedings that Chris Connors, Keith Johnston, and Kevin Kitchin are economically and/or socially disadvantaged as defined in Title 49 C.F.R., Part 26. *Stipulation of Net Worth.*

8. Mountain West works primarily in highway construction performing traffic control, guard rail installation, sign installation and concrete barrier manufacture and installation. *Testimony of Chris Connors.*

9. Mountain West works as both a subcontractor and a prime contractor on MDT projects. *Testimony of Chris Connors.*

10. Montana Department of Transportation (MDT or Department) is an administrative agency of the State of Montana. *Scheduling Order, p. 4.*

11. Patti Schwinden is MDT's Office of Civil Rights Operations Chief. *Scheduling Order, p. 4.*

12. Megan Handl is the Operations Supervisor of the Office of Civil Rights. She reports to Ms. Schwinden. *Testimony of Megan Handl.*

13. Sheila Cozzie, former Office of Civil Rights Bureau Chief, held that position until late 2011. Ms. Cozzie was the Bureau Chief at the time that MDT

submitted its 2011-2014 Goal Methodology to FHWA. *Testimony of Sheila Cozzie.*

14. Wendy Stewart was the former DBE Program Manager. She held the position until late 2012. *Testimony of Megan Handl.*

15. Kevin Christensen is MDT's Construction Engineer. He oversees approximately $400 million in federal aid highway projects each year including contracts, contract plans, pay estimates and MDT's construction database. *Testimony of Kevin Christensen.*

16. The Civil Rights Bureau operates the federal Disadvantaged Business Enterprise ("DBE") program for the Department. *Testimony of Megan Handl.*

Disparity Study

17. In 2007, Montana commissioned a disparity study by D.Wilson, which was completed in 2009, to determine whether there was evidence of discrimination in Montana's transportation industry. *Exhibit 57, Disparity Study, p. ES-1.*

18. The D. Wilson Disparity Study gathered extensive data to calculate disadvantaged business availability in the Montana transportation industry. Based on a review of public records, interviews, assessments as to whether a firm could be considered available for highway projects, as well as

numerous other adjustments, D. Wilson concluded that DBE businesses should be expected to receive 5.83% of contract dollars from MDT projects. *Exhibit 57, Disparity Study, p. ES-1-7; Testimony D. Kyle.*

19. The D. Wilson Study examined over 4800 MDT contracts to determine actual DBE utilization. *Exhibit 57, Disparity Study, p. 5-4; Testimony D. Kyle.*

20. D. Wilson utilized a "disparity index" to determine whether there was evidence of discrimination in the Montana transportation industry. A disparity index compares the availability of DBE's with the utilization of DBE's in a geographical area. A disparity index calculation is obtained by dividing the percent of utilization by the percent of availability and multiplying the result by 100. A disparity index of 100 indicates parity, a balance between utilization and availability. A disparity index of less than 100 may indicate that firms are underutilized. A disparity index of more than 100 may indicate that firms are overutilized. An index of less than 80 indicates significant underutilization. *Exhibit 57, Disparity Study, p. ES-4; Amended Complaint, p. 6; Testimony D. Kyle.*

21. The D.Wilson study grouped contractors by three categories, "professional services" contractors, "construction" contractors, and "business categories

combined," which included both professional services and construction contractors. *Exhibit 57, Disparity Study, p. ES1-; Testimony D. Kyle 7.*

22. D. Wilson analyzed DBE utilization by category of work (construction vs. professional services), funding source, by type of contract (prime and sub), by district or location of the project. It further analyzed contracts with and without project specific goals, analyzed aggregate disparity and evaluated statistical disparity by race and gender. D. Wilson documented substantial statistical disparities in the utilization of African American, Native American, Asian-Pacific American, Hispanic American and women-owned firms in professional contracts within the Montana transportation industry. The Study concluded that all relevant minority groups and women were significantly underutilized in professional services. D. Wilson found substantial statistical disparities in the utilization of Asian-Pacific and Hispanic Americans in combined construction and professional services contracts and concluded these groups were significantly underutilized. D. Wilson also found statistical disparities in the utilization of women in combined construction and professional services contracts and concluded they were underutilized. *Exhibit 57, Disparity Study, p. ES-1-7; Amended Complaint, p.5, 14; Testimony D. Kyle; Testimony Sheila Cozzie.*

23. D. Wilson conducted a regression analysis that analyzed business formation by minorities and women compared to white males in the private sector. The study found that women were 1.69 times less likely to become entrepreneurs in construction services than white males and Native Americans were 3.43 times less likely to become entrepreneurs than white males. The Study likewise found that women were 2.17 times less likely to become entrepreneurs in professional services than white males. *Exhibit 59, Disparity Study Appendices, p. C-8-9; Testimony D. Kyle.*

24. The D. Wilson Study determined that minority-owned and women-owned firms generate lower revenues than non-DBE firms. Only 43% of minority owned firms and 45% of women-owned firms reported gross revenues more than $500,000. Seventy-three percent of non-DBE firms reported gross revenues of more than $500,000. *Exhibit 59, Disparity Study Appendices, Table B2-1; Testimony D. Kyle.*

25. D.Wilson conducted 59 personal interviews with business owners who attested by affidavit to the experiences they described in those interviews. *Exhibit 57, Disparity Study, p. 7-3; Testimony D. Kyle.*

26. D. Wilson interviewed 27 DBE firms – 6 Native American and 21 Caucasian women. The remaining 32 interviewed firms were publicly owned (2) or

Caucasian male owned firms (29).  *Exhibit 57, Disparity Study, p. 7-6; Testimony D. Kyle.*

27. The Disparity Study identified a number of ways in which firms were discriminated against in the Montana contracting industry.  It found that prime contractors engage in bid shopping, and that "DBE subcontractors and non-DBE prime contractors operate under two different standards to the detriment of DBEs."  *Exhibit 57, Disparity Study, p. 7-15; Testimony D. Kyle; Testimony Sheila Cozzie.*

28. The Disparity Study documented numerous instances when prime contractors failed to provide timely payments to DBE firms.  *Exhibit 57, Disparity Study, p. 7-15-19; Testimony D. Kyle.*

29. The Disparity Study documented that almost 60 percent of the Caucasian women owned firms indicated that prompt payment was an issue.  *Exhibit 57, Disparity Study, p. 7-16; Testimony D. Kyle.*

30. The Disparity Study found that both minority and women business owners alleged that they have encountered hostility, prejudice and sexism from Agency officials and majority business owners.  *Exhibit 57, Disparity Study, p. 7-19; Testimony D. Kyle.*

31. The Disparity Study identified a DBE subcontractor who stated that MDT project engineers treated him unfairly due to his race. *Exhibit 57, Disparity Study, p. 7-20; Testimony D. Kyle.*

32. The Disparity Study identified a women owner of a DBE firm who stated that prime contractors ask her foreman, "who's the 'B' in the office," and that certain prime contractors treat her differently because she is a woman. *Exhibit 57, Disparity Study, p. 7-22; Testimony D. Kyle.*

33. The Disparity Study found that fifty percent of Native American owned firms, 69% of women owned firms, and 21% of white male owned firms agreed that there was a "good old boy" network in Montana and that forty percent of DBE's believe that the good old boy network gives advantages to majority firms. *Exhibit 57, Disparity Study, p. 7-3; Testimony D. Kyle 1.*

34. The Disparity Study documented a DBE consultant who stated that, "They (prime contractors) have their 'go to subs.' I pretty much have to come in at our cost to break in." *Exhibit 57, Disparity Study, p. 7-33; Testimony D. Kyle.*

35. The existence of this "good old boy network" was confirmed by MWHC's president, Chris Connors. Mr. Connors testified that he engaged with conversations with prime contractors concerning projects with contract goals

to discuss how Mountain West should submit its bids to the prime contractor. *Testimony of Chris Connors*

DBE Program

36. As a recipient of federal funds, MDT is required to implement a DBE Program. *49 C.F.R. Part 26.*

37. A recipient's implementation of the federal DBE program is subject to extensive federal regulations, requirements, and oversight that limit and proscribe a recipient's authority to operate the DBE program. *49 C.F.R. Part 26.*

38. The Federal Highway Administration ("FHWA") reviews and approves nearly all aspects of MDT's DBE program, from its overall goals, contract goals, and goal methodology to the information displayed on MDT's website. *Testimony of Megan Handl.*

39. Federal regulations require recipients, such as MDT, to prepare and submit overall DBE goals to FHWA. *49 C.F.R. 26.45(f).*

40. If a recipient of federal funds fails to establish and implement goals as provided in 49C.F.R. 45(f), the recipient is not eligible to receive federal financial assistance. *49 C.F.R. 26.45(f)(7).*

41. If a recipient of federal funds establishes and implements goals in a way different from that provided in 49 C.F.R. Part 26, the recipient is not eligible to receive federal financial assistance. *49 C.F.R. 26.45(f)(7).*

42. The federal regulations delineate acceptable methods for recipients to use to calculate overall DBE goals. *49 C.F.R. 26.45(c).*

43. An overall DBE goal is expressed as a percentage of total contract dollars. An overall DBE goal is the level of DBE participation that would be expected on transportation projects absent the effects of discrimination. *49 C.F.R. 26.45(b).*

44. In addition to establishing an overall goal, recipients must also prepare and submit a Goal Methodology describing how the recipient intends on meeting its overall goal. MDT was required to submit a Goal Methodology, including its overall DBE goal, to FHWA for its approval every three years. *49 C.F.R. 26.45(f).*

45. Federal regulations require recipients to submit semi-annual reports to FHWA documenting the extent to which the recipient has met its overall DBE goal. The reports must be prepared in conformance with federal regulations and are on forms prescribed by FHWA entitled Uniform Reports of DBE Awards or Commitments and Payments ("Uniform Reports"). *49 C.F.R. 26.47, 26.55; Appendix B to Part 26.*

46. Federal regulations delineate two general methods by which recipients can meet their overall DBE goal. The two methods, or "means," which are terms of art and somewhat of a misnomer since DBEs are not necessarily owned by minorities, are called "race-neutral" and "race-conscious." *49 C.F.R. 26.51.*

47. The regulations define "race-neutral means" to include various methods by which recipients can assist DBEs in obtaining contracts. They include such things as adjusting the timing of solicitations, bonding assistance, technical assistance, informational programs, supportive services programs, business development programs, publicizing the DBE program, and start-up assistance. *49 C.F.R. 26.51(b).*

48. Recipients are required to meet the maximum feasible portion of their overall goals by using "race-neutral means" of facilitating DBE participation. *49 C.F.R. 26.51(a).*

49. Federal regulations require recipients to use contract goals to meet any portion of its overall goal which it cannot meet using "race-neutral means." *49 C.F.R. 26.51(d).*

50. Contract goals are defined by the federal regulations as "race-conscious." A contract goal (also known as a "project-specific goal") is a goal set by the recipient for a specific construction contract, and is defined as a percentage

of the total project bid price. Over the three year period covered by a Goal

Methodology, recipients must set contract goals so that they will

cumulatively result in meeting any portion of the recipient's overall goal not

met through the use of "race-neutral means." *49 C.F.R. 26.51(d).*

51. A contract goal is the percentage of the total value of a contract that is

expected to be performed by a DBE. *Testimony of K. Christensen.*

52. Federal regulations require that a contract goal provide for participation by

all certified DBEs and cannot be subdivided into group-specific goals.

Consequently, any certified DBE, whether owned by a minority, a woman,

or a white male is eligible to participate on a contract with contract goals.

*49 C.F.R. 26.51(d)(4).*

53. MDT's DBE program did not and does not differentiate between DBE firms.

DBE firms that are owned by minorities or owned by women are treated the

same as DBE firms owned by white males. Prime contractors can meet a

project-specific goal using DBEs owned by minorities, women, or white

males. *Testimony of Megan Handl.*

54. When a recipient places contract goals on a specific construction project,

federal regulations require bidders to use "good faith efforts" to meet the

contract goal. A bidder makes a good faith effort to meet a contract goal if it

1) obtains enough DBE participation to meet the goal, or 2) documents that

it made adequate good faith efforts to meet the goal, even though it did not succeed in obtaining enough DBE participation to meet the contact goal. *49 C.F.R. 26.53(a).*

55. Federal regulations define what constitute "adequate good faith efforts" to meet a contract goal. *49 C.F.R. Part 26, Appendix A.* MDT has adopted the federal definition of adequate good faith efforts in its program. *Exhibit 21.*

56. The federal regulations do not require prime contractors to accept higher quotes from DBEs if the price difference is excessive or unreasonable. *49 C.F.R. Part 26, Appendix A.* Likewise, MDT does not require prime contractors to accept higher quotes from DBEs if the price difference is excessive or unreasonable. *Exhibit 21; Testimony K. Christensen, M. Handl.*

57. MDT's program does not distinguish between contractors who meet a contract goal and contractors who do not meet a contract goal but make adequate good faith efforts to meet the goal. *Testimony of Patti Schwinden.*

58. Prior to the *Western States* decision in 2005, MDT had used race-conscious project specific goals to meet its annual DBE goal. Following that decision, MDT discontinued the use of race-conscious goals while it undertook its disparity study. *Testimony of Sheila Cozzie.*

59. MDT did not re-institute project specific goals until June of 2012. *Testimony of Patti Schwinden; Testimony K. Christensen.*

60. During the six years when MDT utilized solely "race-neutral measures" to meet its annual DBE goal, MDT observed a dramatic drop in the utilization of DBEs on highway contracts. *Testimony of Sheila Cozzie.*

61. This significant drop was one of the primary impetus for MDT's reinstatement of project specific goals. MDT was not able to meet its DBE Goal solely through race-neutral means. Federal regulations require states that are unable to meet their DBE goals through race-neutral means to use project specific goals. *Testimony of Sheila Cozzie; Testimony K. Christensen.*

MDT's DBE Goal Methodology

62. MDT submitted a Goal Methodology to FHWA for the period covering Federal Fiscal Year 2011-2013. The Goal Methodology was approved by FHWA. *Testimony of Megan Handl, Sheila Cozzie; Exhibit 503.*

63. MDT's 2011-2013 Goal Methodology utilized the method for calculating its overall goal outlined in the federal regulations. In setting its overall DBE goal, MDT relied principally on the results of the D.Wilson Disparity Study. MDT established its overall DBE goal as 5.83%. *Exhibit 44.*

64. After setting its overall goal, MDT analyzed past participation of DBEs in transportation contracts. In the three prior years, DBE participation averaged 2.56%. During that time, MDT had only been using "race-neutral"

means to meet its previous overall DBE goal. In order to conform with federal regulations, MDT determined that because past participation was less than its overall goal, it would be necessary to utilize "race-conscious" contract goals to meet its overall goal. It determined that it would be able to meet 2.56% of its overall goal through race-neutral means, and that it would need to meet 3.27% of its overall goal through the use of contract goals. *Exhibit 44.*

65. MDT's Goal Methodology relied on the low utilization in the prior years in which it had used solely race-neutral means to meet its goal to support its use of contact goals. *Exhibit 44.*

66. MDT's Goal Methodology also relied on statistical data from the D. Wilson Disparity Study to support its use of contract goals. *Exhibit 44.*

67. MDT's Goal Methodology also relied on anecdotal evidence of discrimination to support its use of contract goals. *Exhibit 44.*

68. Contract goals were required by FHWA regulations and by FHWA representatives in Montana. *Testimony of Sheila Cozzie; Testimony K. Christensen.*

69. FHWA approved MDT's FFY 2011—2013 Goal Methodology, its overall goal, and MDT's intent to utilize contract goals to meet that portion of its

overall goals it could not meet using "race-neutral" means. *Testimony of Sheila Cozzie; Exhibit 503.*

70. The Department utilized project-specific goals during the period June 2012 through May 2014. *Testimony of Patti Schwinden; Testimony K. Christensen.*

71. In the same time period, there were approximately 105 certified DBE firms performing highway related work in Montana. *Testimony of Megan Handl.*

72. In the same time period, there were 8 DBE firms owned by white males. *Testimony of Megan Handl.*

73. Between July 2012 and June 2014 MDT placed project-specific goals on 62 out of 237 total projects. *Testimony of Kevin Christensen.*

74. Of those 62 projects with goals, the low bidder failed to meet the DBE goal on 4 projects. *Testimony of Patti Schwinden; Testimony K. Christensen.*

75. One of the 4 projects was rescinded. Of the remaining three, MDT determined that on two the apparent low bidder did not make a good faith effort to meet the goal and were not awarded a contract. *Testimony of Patti Schwinden; Testimony K. Christensen.*

76. On the third contract MDT determined that although the low bidder did not meet the DBE goal, it had made good faith efforts. The bidder had rejected quotes from three DBEs as unreasonably high, and gave the work instead to

three non-DBE firms (one of which was Mountain West). MDT concurred and awarded the contract to the low bidder. *Testimony of Patti Schwinden; Testimony K. Christensen.*

77. Some contractors have made the business decision to simply meet a project specific goal rather than make and document good faith efforts. *Testimony of Loren Blossom; Testimony of Dwayne Rehbein.*

MWHC'S Alleged Damages

78. MWHC's gross revenue does not support its claim for economic damages. MWHC's gross revenue on MDT projects has increased in all categories of work. Testimony of Jason Gilliam, Testimony Bryce Ward.



79. The data demonstrates that between 2011-2013 MWHC's revenue increased in all categories of work, and concrete barrier revenue more than doubled in that time period. Testimony of Jason Gilliam, Testimony Bryce Ward.

80. MWHC's market share data does not support its contention that it suffered economic damages due to the DBE program. The numbers demonstrate the MWHC has a dominant share of the market in all but one category of work for which it is claiming damages. In 2013, it had an overall share of 73.85% of all concrete work, 70.96% of all guardrail work, 54% of all signing work and 44.13% of all traffic control. Testimony of Jason Gilliam, Testimony Bryce Ward.



81. While looking at the traffic control data in isolation may lead one to believe that MWHC is losing market share because of the DBE program; that theory is refuted by the fact that MWHC is gaining market share in signing and guardrail, and dominating the market in concrete. Testimony of Jason Gilliam, Testimony Bryce Ward.

82. Further, MWHC has obtained a greater market share on projects with DBE goals than those without in all categories of work with the exception of guardrail, and obtained 59.9 % of the guardrail work on projects with DBE goals in that category. Testimony of Jason Gilliam, Testimony Bryce Ward.



83. MWHC provides no evidence or analysis to substantiate its claim that MDT's implementation of project specific goals pursuant to the federal DBE program inflicted economic damage. Testimony of Jason Gilliam, Testimony Bryce Ward.

84. Next, the projected profit margins on Larson's spreadsheet are inconsistent with the profit margin set forth in the job cost sheets MWHC produced for those projects and categories for work. Testimony of Jason Gilliam, Testimony Bryce Ward.



**Guardrail: Comparing Projected Profit on Job Cost Reports to Laron's Worksheet**

- ■ Profit From Cost Sheets
- ■ Larson's Worksheet

85. Based upon Connor's testimony and MWHC's job cost reports, Larson's decision to use an average profit margin to determine economic damages on the specific projects does not accurately portray expected profit since each project is uniquely bid based upon job related factors. Ms. Larson's figures are purely speculative based on historic averages and significantly inflated, based upon the MWHC's own bid documents which do not support that level of profits. Testimony of Jason Gilliam, Testimony Bryce Ward.

86. MWHC has alleged that it lost four subcontracts as a result of MDT's imposition of contract goals in 2012. Mountain West alleges that on these four subcontracts with contract goals, it submitted the low bid to the prime contractor, but that because there were contract goals on the project, the prime contractor selected a DBE firm to perform the work even though the DBE firm's bid was higher. MWHC further alleges that it lost profits on

these four projects, for which it seeks relief in money damages. *Amended Complaint, p. 8-9.*

87. One of the projects MWHC alleges damages was Libby-West. MWHC was not the low quote for the prime contractor that was awarded the project.

88. One of the projects in which MWHC alleges it was damaged was known as "Canyon Ferry Road – Helena." On or about September 20, 2012, Mountain West submitted a quote to the prime contractor, Helena Sand and Gravel. Mountain West's quote included items for traffic control, guard rail and signage. *Exhibit 17.*

89. HL Construction, a certified DBE owned by a Native American woman, also submitted a quote to Helena Sand and Gravel. HL's quote included items for traffic control, guard rail, and signage.

90. HL Construction is a certified DBE. It's DBE status is based, in part, on the gender and the race of the owner. HL Construction would be eligible for DBE certification regardless of the race of the owner. *Testimony of Megan Handl.*

91. Helena Sand and Gravel contracted with HL Construction for the traffic control, guard rail and signage work.

92. Another project in which MWHC alleges it was damaged was known as "Amsterdam Road/I-90 Eastbound Onramp." On or about October 10, 2012,

Mountain West submitted a quote to the prime contractor, Knife River Belgrade. Mountain West's quote included items for traffic control, guard rail, concrete barrier rail, and signage. In its quote, Mountain West marked its quote for concrete barrier rail work with an asterisk, and indicated in its quote that the "*" meant that "Item can be deleted from quotation." *Exhibit 3*.

93. Knife River awarded Mountain West the traffic control, guard rail, and signage work. Knife River deleted the concrete barrier work from the quote and awarded that work to L & J Construction Group.

94. L & J Construction Group is a certified DBE owned by a Native American woman. It's DBE status is based, in part, on the gender of the owner. L & J Construction would be eligible for DBE certification regardless of the race of the owner. *Testimony of Megan Handl.*

95. Another project for which MWHC claims damages is Bonner Interchange – East. On or about November 7, 2012, Mountain West submitted a quote to Riverside Contracting, the prime contractor awarded the project. Mountain West's quote included items for guard rail, traffic control and signage.

96. Riverside Contracting awarded Mountain West all of the work for which Mountain West submitted a quote. *Testimony of Dwane Rehbein.*

97. The last project for which MWHC alleges damages is the Norris East project. On or about November 7, 2012, Mountain West submitted a quote to Schellinger Construction, the prime contractor on the project. Mountain West's quote included prices for a variety of work items. One work item in the quote was for tall concrete barrier rail, which was quoted at a total cost of $136,710.00. In its quote, Mountain West told the Schellinger that it intended on subcontracting the tall barrier rail work to L & J Construction, a DBE. MWHC had no mark-up in its quote. *Testimony of Chris Connors.*

98. Schellinger contracted with Mountain West for all of the work in Mountain West's quote, except for the tall concrete barrier rail. Rather than contract with Mountain West, Schellinger contracted directly with L & J Construction for the work, at the same price quoted by Mountain West. *Testimony of Bob Warren.*

99. When MDT placed a project-specific goal on a project, the goal was expressed as a percentage of the total bid price. For example, if there was a 5% project-specific DBE goal on a project, and the successful prime contractor bid $1,000,000, on the project, the prime contractor was expected to either subcontract $50,000 of the work to a DBE subcontractor or demonstrate that it had made good faith efforts to subcontract that amount but was unable to do so. *Testimony K. Christensen*

100.    The Department does not consider an awardee's race, color and national origin when it awards contracts.   The Department has never withheld a contract from MHWC based upon the sex, race, color or national origin of the owners of MWHC.  *Testimony of Chris Connors; Testimony of Patricia Schwinden;  Plaintiff's Response to Defendants' Third Discovery Requests, Request for Admission No. 8.*

101.    Even if MDT did not use the race-conscious presumptions in the Federal program to certify small businesses as socially and economically disadvantaged, it still would have been required to implement a DBE program for small businesses owned by socially and economically disadvantaged individuals.  *Testimony of Megan Handl.*

102.    MWHC would not have been entitled to DBE status based upon its gross receipts and the net worth of its shareholders.  *Agreed Facts, PTO.*

103.    MWHC alleged that "Montana has instituted policies and practices which exceed the United States Department of Transportation requirements for Disadvantaged Business Enterprise use."  The only MDT policy or practice MWHC identified as exceeding federal requirements was 49 C.F.R. 26.33, which addresses overconcentration of DBEs.  *Plaintiff's Response to Defendant's First Discovery Requests, Interrogatory No. 11.*

104.    MDT has never made a determination that overconcentration exists in the type of work performed by MWHC, i.e. traffic control, signing, guardrail and concrete barrier. *Testimony of Megan Handl.*

105.    MDT has complied with the federal requirements in its implementation of the federal DBE program. *Testimony of Megan Handl.*

106.    According to MWHC, it has four competitors, each of which is a DBE. *Testimony of Chris Connors.*

107.    This testimony was rebutted by MDT, which provided evidence that there are more than four contractors performing traffic control, concrete barrier, guard rail and signage work. *Testimony of Kevin Christensen.*

108.    An analysis of the MDT work received by MWHC on the one hand, and all DBEs combined, on the other over the period in question shows that MWHC has a commanding portion of the market share. *Testimony of Kevin Christensen.*

109.    MDT analyzed Department records of contracts performed by Mountain West Holding Company for traffic control, signing, guardrail and concrete barrier work, and determined that Mountain West has obtained the following percentages of the total subcontracted work on Department projects, between 2010 and 2014, as follows:

| 2010 | 2011 | 2012 | 2013 | 2014 |
|------|------|------|------|------|

| | | | | | |
|---|---|---|---|---|---|
| Traffic Control | 55.82% | 54.58% | 50.33% | 44.13% | 50.58% |
| Guardrail | 67.94% | 64.15% | 56.50% | 70.96% | 59.92% |
| Signing | 66.73% | 48.90% | 56.42% | 54.08% | 60.30% |
| Conc.Barrier | 80.18% | 76.34% | 66.70% | 73.85% | 69.11% |

*Testimony of Kevin Christensen.*

110.　　MDT analyzed Department records concerning the type of work performed by Mountain West Holding Company, i.e. traffic control, signing, guardrail and concrete barrier work, and determined that DBE firms have obtained the following percentages of the total subcontracted work on Department projects, between 2010 and 2014, as follows:

| | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Traffic Control | 6.49% | 15.49% | 20.58% | 48.09% | 45.83% |
| Guardrail | 9.77% | 17.63% | 27.31% | 25.41% | 33.54% |
| Signing | 7.35% | 14.64% | 21.97% | 27.09% | 38.97% |
| Conc.Barrier | 1.30% | 10.57% | 24.23% | 5.31% | 4.89% |

*Testimony of Kevin Christensen.*

111.　　Mountain West does not contend that the federal program is unlawful. It's lawsuit is an as applied challenge to MDT's implementation of the federal DBE program.

112. There is nothing in the MDT program that distinguishes between minorities on the one hand, and white males on the other. *Testimony M. Handl.*

113. The only area in which the either the federal DBE program or the MDT program makes a distinction between minorities and white males on the other is the federal program's rebuttable presumption, which Mountain West does not challenge, that members of specified minority groups and women are socially disadvantaged. *49 C.F.R. § 26.61.*

114. Testimony by various witnesses demonstrates the existence of a good old boy network in Montana's highway construction industry.

115. Montana conducted a second disparity study which was prepared by Keen Independent Research in 2016. *Keen Disparity Study; Testimony M. Handl.*

116. The Keen Study focused on the participation of minority and women owned firms in MDT contracts from 2009 through 2014. *Keen Study, ES-1.*

117. The Keen Study collected information regarding 6,679 contracts entered into during the study period. *Keen Study, ES-2.*

118. The Study examined quantitative and qualitative information about the Montana contracting industry through survey research, secondary data and in-depth interviews. *Keen Study, ES-3.*

119.     The Study examined the availability of business for MDT contracts

through telephone interviews, and assessed availability based upon size and

location of projects.  *Keen Study, ES-3.*

120.     The Study examined the availability of minority, women and

majority-owned to compare with MBE and WBE utilization.  *Keen Study,*

*ES-3.*

121.     The Study created an MDT master bidder's list totaling 959 firms.

216 firms were identified as minority owned businesses (MBE) or white

women owned businesses (WBE).  *Keen Study, ES-3.*

122.     The Study performed a dollar-weighting to determine MBE/WBE

availability.  The dollar weighted availability for FHWA contracts of

minority owned businesses was 7.69%.  *Keen Study, ES-5.*

123.     The Study found quantitative and qualitative information that there is

not a level playing field for minorities and minority owned businesses in the

Montana transportation contracting industry.  *Keen Study, ES-8.*

124.     Quantitative information indicates disparities regarding entry and

advancement as employees within the industry, disparities in business

ownership, disparities concerning access to capital and bonding, and

disparities in success of minority owned construction firms.    *Keen Study,*

*ES-8.*

125.    There is substantial qualitative evidence of a good old boy network that negatively affects opportunities for businesses owned by minorities. *Keen Study, ES-8.*

126.    Minority owned firms received 1.6 percent of the contract dollars for MDT contracts without DBE contract goals, which is below the 8.3 percent level that would be expected based on the availability analysis. *Keen Study, ES-9-10.*

127.    A disparity index of less than 100 indicates a disparity between utilization and availability, and disparities less than 80 are described as substantial. *Keen Study, ES-10.*

128.    The disparity index for MBEs is 19. The disparity index for minority groups ranged between a high of 25 for native Americans to a low of 0 for African Americans and subcontinent Asian Americans. *Keen Study, ES-11.*

129.    The Keen Study conducted a statistical simulation to determine whether chance could explain the disparities and found with a 95 percent confidence level that chance did not explain the disparities. *Keen Study, ES-11.*

130.    MWHC cannot establish that a decision by this Court striking the presumption of social disadvantage from the program would result in any meaningful relief for MWHC. It would still have to compete against the

same DBEs on projects in which MDT established project specific goals for DBE participation. *Plaintiff's Amended Responses to Defendants' Third Discovery Requests, Request for Admission No. 3.*

131.    Even if MDT did not use race-conscious presumptions to certify small businesses as socially and economically disadvantaged, it still would have been required to implement a DBE program and provide opportunities to socially and economically disadvantaged firms. *Testimony of Megan Handl.*

132.    MWHC would not have been entitled to DBE status based upon its income and the income of its shareholders. *Testimony of Megan Handl.*

133.    During the period of 2012 through 2014, MDT certified 7 DBEs that were owned by white males. *Testimony of Megan Handl.*

134.    There are 109 certified DBEs owned by white women and approximately 61% percent of certified DBE's in Montana are owned by Caucasians. *Testimony of Megan Handl.*

135.    MDT and its employee have never discriminated against women or minorities in the award or performance of MDT administered contracts. *PSMF No. 36.*

136.    MDT awards prime contracts to the low competitive bidder who has met the contract specifications. *Testimony of Kevin Christensen*

137.    MDT's award of prime contracts is race neutral.

138.    To the extent that the foregoing Findings of Fact are Conclusions of Law, they are incorporated below in MDT's Proposed Conclusions of Law. To the extent that MDT's following Conclusions of Law are Findings of Fact, they are incorporated above in MDT's proposed Findings of Fact.

## CONCLUSIONS OF LAW

1. The Disadvantaged Business Program (DBE) is a program mandated by Congress that applies to Federal-aid highway funding issued by the United States Department of Transportation (USDOT) to states for transportation-related projects. *Scheduling Order, p.4.*

2. Congress first enacted the DBE Program in 1982 through the *Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f), 96 Stat. 2097, 2100.* It reauthorized the DBE Program in the *Moving Ahead for Progress in the 21st Century Act, Public Law 112-141 ("MAP-21").*

3. Congress has set an "aspiration goal" that USDOT spend at least ten percent of its funds with small business owned and controlled by "socially and economically disadvantaged individuals." *Pub.L.No. 112-141, §1101(b)(3).*

4. USDOT had adopted comprehensive regulations for the creation, operation and oversight of the DBE program. *49 C.F.R. Part 26.*

5. The federal DBE program requires states that receive federal funds to implement a local DBE program that conforms with federal regulations and that is approved by USDOT.

6. A local DBE program is required to certify small businesses as a Disadvantaged Business Enterprise if they are primarily owned and controlled by individuals that are "socially and economically disadvantaged" as defined by federal regulations. *49 CFR § 26.61*.

7. A DBE is a firm at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged. *49 C.F.R. 26.5*.

8. The federal regulations define DBE eligibility. To qualify for consideration as a DBE, a firm must meet the definition of a small business as defined by the Small Business Administration and its annual gross receipts over the previous three fiscal years must be less than $22.41 million. *49 C.F.R. 26.65. 49 C.F.R. § 26.65(a) &(b)*.

9. To qualify as a DBE, an individual owner must be socially and economically disadvantaged. The federal regulations define an individual as socially disadvantaged if they have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups  and without regard to their individual qualities. *Appendix E, 49 C.F.R. Part 26.*

10. An individual is economically disadvantaged if their personal net worth is less than $1.32 million. *49 C.F.R. 26.67(2)(i).*

11. Mountain West is not eligible to be certified as a DBE because it is not a small business and its owners are neither socially nor economically disadvantaged. *Stipulation of Net Worth.*

12. The federal regulations include a Uniform Application Certification Form. The form requires individual applying for DBE status for their firm to certify under oath that they are socially disadvantaged, economically disadvantaged, and that their personal net worth does not exceed $1.32 million dollars. *49 C.F.R. Part 26, Appendix F.*

13. Federal regulations require that recipients of federal funds, such as MDT, must rebuttably presume that U.S. citizens who are women, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, or other minorities found to be socially disadvantaged by the Small Business Administration, are socially and economically disadvantaged individuals. *49 C.F.R. 26.67(a).*

14. Federal regulations require recipients of federal funds such as MDT to rebuttably presume that members of groups designated in § 26.67(a) are socially and economically disadvantaged, and that members of these groups

do not have the burden of proving that they are socially and economically disadvantaged. *49 C.F.R. § 26.61.*

15. A small business seeking certification as a DBE can establish that's its owners are socially and economically disadvantaged in two ways. First, by establishing eligibility on a case by case basis; or second, by attesting under oath that the owners are Black American, Hispanic American, Native American, Asian-Pacific American, Subcontinent Asian American, or a woman and that they and the business meet the income requirements. *49 CFR § 26.5.*

16. The federal regulations specifically provide that firms owned by individuals who are not presumed to be socially and economically disadvantaged may qualify as DBEs if they can establish that the owners are, in fact, socially and economically disadvantaged. *49 C.F.R. 26.67(d).*

17. When the personal net worth of a DBE owner exceeds $1.32 million dollars, the presumption of economic disadvantage is rebutted. *49 C.F.R. 26.67(b).*

18. The federal DBE program makes two general distinctions between the type of assistance recipients provide to DBE firms.

19. "Race-neutral" measures or programs are ones that can be used to assist all small businesses, whether they are DBEs or not. *49 C.F.R. 26.5.*

20. "Race-conscious" measures or programs are one that are focused specifically on assisting only DBEs. *49 C.F.R. 26.5.*

21. The terms "race-neutral" and "race-conscious" in the DBE program are misnomers. They are more properly defined as "DBE-neutral" and "DBE-conscious."

22. Mountain West is not challenging the federal program or the federal regulations. Its Complaint is a challenge to MDT's implementation of the federal program. *Response of MWHC to MDT's Motion for Summary Judgment, p. 15.*

23. Mountain West does not allege that the rebuttable presumption in the federal regulations violates federal law.

24. To the extent that Mountain West is challenging the Department's implementation of the rebuttable presumption in the federal regulations, its challenge is an impermissible collateral attack on the federal regulations. *Associated General Contractors.*

MDT's DBE Program Conform to Federal Regulations.

25. Mountain West has alleged that MDT "has instituted policies and practices which exceed the United States Department of Transportation requirements for Disadvantaged Business Enterprise (DBE) use." *Amended Complaint, p. 5.*

26. In response to MDT's discovery requests to specify each policy or practice that exceeded federal requirements, Mountain West identified a single policy or practice. "MDT implemented race, national origin, and gender based goals despite overutilization of DBE's in subcontracting." Mountain West stated that MDT's policy or practice was in violation of 49 C.F.R. 26.33. *Response to MDT's First Discovery Request, Interrogatory No. 11.*

27. The federal regulations require recipients of federal funds to take "appropriate measures" when the recipient determines that DBE firms are "overconcentrated." The regulations define overconcentration as a situation in which "DBE firms are so overconcentrated in a certain type of work as to unduly burden the opportunity of non-DBE firms to participate in this type of work." *49 C.F.R. 26.33(a).*

28. MDT has not determined that there is an overconcentration of DBEs in the type of work engaged in by Mountain West.

29. The evidence shows that there is no overconcentration of DBEs in guardrail, traffic control, signage and concrete barrier work. The evidence shows that Mountain West controls between half and three-quarters of the market in these areas of work. Rather than demonstrating overconcentration by DBEs, the evidence demonstrates Mountain West owns the lion's share of the market.

30. MDT's policies and practices do not exceed the United States Department of Transportation regulations in 49 C.F.R. 26.33. Mountain West does not allege that any other MDT policy or practice exceeds USDOT regulations.

31. In *Western States,* the Ninth Circuit determined that even though a state's DBE program comports with the federal statute and regulations, a state cannot implement a program that provides "an unconstitutional windfall to minority contractors solely on the basis of their race or sex," *Id.* at 997-8, unless it determines that "the effects of discrimination are actually present" in the state, and that, "even when discrimination is present within a State, a remedial program . . . is limited to those minority groups that have actually suffered discrimination." *Id.* at 998.

32. It is not readily apparent from the Western States decision whether the contract goals in that case were the same contract goals that MDT placed on its contracts. The project at issue in *Western* States was a City of Vancouver project, not a state project. Apparently, the State was responsible for funneling federal funds to the City for the project. In the instant litigation, the disputed projects are all state projects. Concerning the contract goals, the Ninth Circuit stated that, "[i]n order to comply with TEA-21's minority utilization requirements, the State mandated that the city obtain 14% minority participation on the project." *Id.* at 987. [emphasis added]. In a

footnote, the Court stated that the term minority included "racial minorities and women." *Id.* The Court referred to the contract goals at issue as "the contract's <u>minority utilization requirement</u>." *Id. [emphasis added].*

33. MDT's contract goals do not require a prime contractor to utilize minorities to meet its contract goals. Rather, MDT's contract goals require prime contractors to utilize <u>DBEs</u> to perform a percentage of the contract work. MDT does not mandate that the DBEs be minority-owned firms. Because DBEs may be owned by minorities, women or white males, MDT's contract goals do not make distinctions based on race or gender. MDT's contract goals, unlike the contract goals in *Western States,* are neutral on their face.

34. The only part of the MDT's DBE program which is not facially neutral is the rebuttable presumptions of social and economic disadvantage in the federal DBE program.

35. The federal program, including the rebuttable presumption of social and economic disadvantage, is constitutional on its face. *Western States Paving v. Washington,* 407 F.3d 983, 995 (9th Cir. 2005).With the exception of the rebuttable presumption required by the federal regulations, the Department's DBE program does not contain any race or gender-based presumptions and does not treat DBE firms differently than non-DBE firms on the basis of race or gender.

36. Mountain West has not identified any application of the rebuttable presumption by MDT that differs from the facially constitutional rebuttable presumption.

37. Because MDT's contract goals are facially neutral, in order for Mountain West to prove that MDT's contract goals discriminate, Mountain West would have to establish the MDT's facially neutral contract goals have a disparate impact on Mountain West.

38. To state a claim under Title VI, MWHC must show that actions of the defendants had a discriminatory impact, and that defendants acted with an intent or purpose to discriminate based upon plaintiffs' membership in a protected class. *Lee v. City of Los Angeles,* 250 F.3d 668, 686–87 (9th Cir.2001)

39. Title VI prohibits only intentional discrimination.

40. There is no private right of action for disparate impact discrimination under Title VI. *Cowell v. Dept. of Health and Human Services,* 558 F.3d 1112, 1129 (9th Cir 2009), citing *Alexander v. Sandoval,* 532 U.S. 275 (2001).

41. Claims brought under Title VI cannot be based on the disparate impact of a facially neutral policy. Proof of racially discriminatory intent or purpose is required to show a violation of Title VI. *Reynolds v. Barrett,* 685 F.3d 193, 201 (2nd Cir. 2012); *Save our Valley v. Sound Transit,* 335 F.3d 932 (9th Cir.

2003); *Adams v. City of Indianapolis,* 742 F.3d 720, 726 fn. 3(7th Cir. 2014);

*Henley v. Brown, 686 F.3d 634, 642 (8thCir. 2012).*

42. MDT's contract goals are facially neutral. Mountain West has not

presented any evidence that the Defendants intentionally discriminated

against Mountain West. Mountain West cannot rely on a disparate impact

theory to support its claims of discrimination.

43. Defendants State of Montana and Department of Transportation did not

discriminate against Mountain West and did not violate Section 601 of Title

VI.

44. While the differences in the contract goals in *Western States* and this

litigation is dispositive, out of an abundance of caution the Court will

consider application of the *Western States* decision regarding a state's

narrow tailoring requirements.

45. In *Western States,* the Court "devised a two-prong test for narrow tailoring:

(1) the state must establish the presence of discrimination within its

transportation contracting industry, and (2) the remedial program must be

limited to those minority groups that have actually suffered discrimination."

*Associated General Contractors, at* 1196.

46. The Ninth Circuit has not yet clearly articulated the level of proof necessary

to establish narrow tailoring. However, the Court in *Western States*

indicated that a state must merely provide some evidence of discrimination in the contracting industry. "Whether Washington's DBE program is narrowly tailored to further Congress' remedial objective depends upon <u>the presence or absence</u> of discrimination in the State's transportation contracting industry. If <u>no such discrimination</u> is present in Washington, then the State's DBE program does not serve a remedial purpose. . ." *Id.* at 997-8. The Court concluded that Washington's program was insufficient because, "the record was devoid of <u>any evidence</u> suggesting that minorities currently suffer – or have ever suffered – discrimination in the Washington transportation contracting industry." *Id.* at 1002 (emphasis added).

47. The law does not require absolute proof of discrimination before a state may implement an affirmative action program. "Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. . . . Under such circumstances the city could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria." *Croson* at 469. "[T]he Fourteenth Amendment does not require a court to make an ultimate judicial

finding of discrimination before [the government] may take affirmative steps to eradicate discrimination." *Concrete Works* at 1522 [citing *Wygant v. Jackson Bd. of Education,* 467 U.S. 267, 292 (1986)].

48.In order to meet the narrow-tailoring requirement enunciated in *Western States,* MDT must provide some evidence to support an inference of discrimination in Montana and there is some evidence to support an inference of discrimination against each of the relevant minority groups and women.

49.Courts may consider both statistical and anecdotal evidence of discrimination.

50.Affidavits attesting to discrimination in the local construction industry can "certainly suggest that ongoing discrimination may be occurring in much of the [local] business community." *Coral Construction Co.* at 918. Montana's Disparity Study conducted 59 personal interviews with business owners who attested by affidavit to the experiences they described in those interviews. There were 27 DBE firms interviewed – 6 Native American and 21 Caucasian women. The remaining 32 firms were publicly owned (2) or Caucasian male owned firms (29).

51. Those affidavits attested to a variety of practices of on-going discrimination in Montana, including bid shopping, failure to pay subcontractors, hostility, prejudice and sexism, and a "good old boy" network.

52. Wendy Stewart, Patti Schwinden, and Sheila Cozzie all testified as to anecdotal evidence of discrimination they were made aware of by subcontractors.

53. In *H.B. Rowe v. Tippett,* 615 F.3d 233 (4th Cir 2010), the state presented anecdotal evidence of a "good old boy" network in the contracting industry. The Court found that "such networks exert a chronic and pernicious influence on the marketplace that calls for remedial action." *Id.* at 251. "Federal courts and regulations have identified precisely these factors as barriers that disadvantage minority firms because of the lingering effects of discrimination." *Associated General Contractors, at* 1197-8 [citing *Western States,* at 992].

54. The D.Wilson Study identified anecdotal evidence of a "good old boy" network in Montana, in which prime contractors have their "go-to" subcontractors. Mountain West's president testified that it would communicate with prime contractors prior to submitting quotes to coordinate which items Mountain West should bid on.

55. The D. Wilson Study examined over 4800 MDT contracts to determine actual DBE utilization. D. Wilson D. Wilson analyzed DBE utilization by category of work (construction vs. professional services), funding source, by type of contract (prime and sub), by district or location of the project. It further analyzed contracts with and without project specific goals, analyzed aggregate disparity and evaluated statistical disparity by race and gender. It documented substantial and significant statistical disparities in the utilization of African American, Native American, Asian-Pacific American, Hispanic American and women-owned firms in professional contracts within the Montana transportation industry. D. Wilson found substantial statistical disparities in the utilization of Asian-Pacific and Hispanic Americans in combined construction and professional services contracts. D. Wilson also found statistical disparities in the utilization of women in combined construction and professional services contracts. These disparities support an inference of discrimination in the Montana highway construction industry. *Associated General Contractors at* 1191. MWHC does not dispute these disparities. *First Amended Complaint, p. 5, 14.*

56. Disparities in business formation provide statistical evidence of discrimination. *Concrete Works of Colorado v. City and County of Denver,* 321 F.3d 950, 977 (19th Cir. 2003). The Study found that women were 1.69

times less likely and Native Americans were 3.43 times less likely to become entrepreneurs in construction services than white males. The Disparity Study found that in Montana, women were 2.17 times less likely to become entrepreneurs in professional services than white males.

57. During the six years MDT utilized solely race-neutral measures to meet its annual DBE goal, MDT observed a dramatic drop in the utilization of DBEs on highway contracts. This significant drop was the primary impetus for MDT's reinstatement of project specific goals. When minority business participation drops when a race-conscious program is discontinued, "it strongly supports the government's claim that there are significant barriers to minority competition in the public subcontracting market, raising the specter of racial discrimination." *Adarand Constructors v. Slater,* 228 F.3d 1147, 1174 (10th Cir. 2000). [See also *H.B. Rowe v. Tippett,* 615 F.3d 233, 247-8 (4th Cir. 2010); *Sherbrooke Turf v. Minnesota,* 345 F.3d 964, 973-4 (8th Cir. 2003)].

58. The D. Wilson Study determined that minority and women-owned firms generate lower revenues than non-DBE firms. Only 43% of minority owned firms and 45% of women-owned firms reported gross revenues more than $500,000. Seventy-three percent of non-DBE firms reported gross revenues of more than $500,000. Evidence of disparities in revenues provide an

inference of discrimination in the Montana construction industry. *Concrete Works of Colorado v. City and County of Denver,* 321 F.3d 950, 981-2 (19th Cir. 2003).

59. Montana is entitled to look at the evidence in its entirety to determine whether there are substantial disparities in utilization of minority firms practiced by some elements of the construction industry. It is enough that the anecdotal evidence supports statistical data showing a pervasive pattern or discrimination. *M.K. Weeden v. Montana,* 2013 WL 4774517 at *4 (D.Mont).

60. There is both anecdotal and statistical evidence of discrimination in the Montana transportation and highway construction industry.

61. There is anecdotal evidence of discrimination against Native Americans and women in the Montana transportation and highway construction industry.

62. There is statistical evidence of discrimination against all relevant minority groups and women in the Montana transportation and highway construction industry.

63. MDT need not show underutilization in every measured category of contract. Rather it meets the evidentiary standard if looking at the evidence in its entirety the data show substantial disparities in utilization of minority

firms suggesting a system of racial exclusion practiced by elements of the local construction industry. *Associated General Contractors at* 1197.

64. MDT has met its burden of proving that there is discrimination in the transportation industry in Montana.

65. MDT has met its burden of proving that all of the relevant minority groups and women have been discriminated against in Montana.

66. MDT's implementation of the federal DBE program is narrowly tailored.

67. Mountain West has not met its ultimate burden of proving that MDT's DBE program is unconstitutional. *Officers of Justice v. Civil Service Comm.,* 979 F.2d 721, 724 (9th Cir. 1992); *Wygant v. Jackson Bd. of Education,* 476 U.S. 267, 277-8 (1986).

68. "The equal protection clause requires similar treatment of similarly situated persons; it does not require things which are different in fact or opinion to be treated in law as though they were the same." *Harvey v. Town of Merrillville,* 649 F.3d 526, 531 (7th Cir. 2011).

69. MWHC is not a small business and its owners are not socially or economically disadvantaged as defined by federal regulations. *Stipulation of Net Worth.*

70. Mountain West is not similarly situated to certified DBEs because it is not a small business and because its owners are neither socially nor economically disadvantaged.

71. The law does not require similar treatment of persons or entities that are not similarly situated. Because Mountain West is not similarly situated to DBEs, the fact that MDT may have treated DBEs differently than Mountain West is not a violation of the Fourteenth Amendment.

72. Mountain West's Third Claim alleges a violation of Title VI. Mountain West alleges that the State of Montana "is involved in race, color and national origin discrimination because it gives preference in awarding contracts based upon the awardee's race, color, and national origin. . ." *Amended Complaint, p. 16.* Mountain West has failed to present any evidence that MDT's considers an awardees' race, color or national origin when MDT awards contracts.

73. Title VI provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *42 USC 2000d.* Title VI prohibits discrimination on the basis of race or national origin. Title VI does not prohibit discrimination based upon gender. Mountain West alleges that

it lost contracts and seeks lost profits under Title VI.  In order for Mountain West to prevail, it must prove that its lost profits were caused by racial or national origin discrimination.  This Mountain West has failed to do.  The four projects which Mountain West alleges it lost on the basis of race were projects that were awarded to DBEs owned by women.  Thus, while Mountain West's may have been subjected to discrimination, it is not entitled to damages since Title VI does not prohibit gender discrimination.

74. Mountain West has failed to prove a violation of Title VI.


DATED this 20th day of February, 2018.


                              /s/ David L. Ohler
                              DAVID L. OHLER
                              VALERIE D. WILSON
                              Attorneys for Defendants

# CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on the 20th day of February, 2018, which will send notification of said filing to the following:

Mark D. Parker     markdparker@parker-law.com
Gary Lofland       glofland@glofland.net
Casey Heitz       caseyheitz@parker-law.com

*/s/ David L. Ohler*