Gary Lofland
MEYER, FLUEGGE & TENNEY
230 South Second Street
PO Box 22680
Yakima, WA 98907
Telephone: (509) 452-2828
Facsimile: (509) 575-4676
E-mail: glofland@glofland.net

Mark D. Parker
Casey Heitz
PARKER, HEITZ & COSGROVE, PLLC
401 North 31st Street, Suite 805
P.O. Box 7212
Billings, MT 59103-7212
Telephone: (406) 245-9991
Facsimile: (406) 245-0971
E-mail: markdparker@parker-law.com
        caseyheitz@parker-law.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

───────────────────────────────────────────────

| | | |
|---|---|---|
| MOUNTAIN WEST HOLDING CO., INC., | ) ) ) | Cause No. CV-13-49-BLG |
| Plaintiff, | ) ) | |
| v. | ) ) | **MOUNTAIN WEST HOLDING COMPANY'S TRIAL BRIEF** |
| STATE OF MONTANA; AND MONTANA DEPARTMENT OF TRANSPORTATION, | ) ) ) ) | |
| Defendants. | ) | |

───────────────────────────────────────────────

# TABLE OF CONTENTS

I.     INTRODUCTION...........................................................................1

II.    THE DBE PROGRAM IS "PRESUMPTIVELY INVALID" .........................2

III.   TITLE VI: THE REQUIRED PROOF AND ANALYSIS...............................2

    A.    THE ELEMENTS OF PROOF..........................................................2
    B.    THE PRIMA FACIE CASE.............................................................3
    C.    THE BURDEN OF JUSTIFICATION OF THE USE OF RACIAL CLASSIFICATIONS
          UPON THE STATE...................................................................3

IV.    PROOF OF INTENT ....................................................................3

V.     THE REQUIRED PROOF TO JUSTIFY RACE BASED PREFERENCES ...5

    A.    NO DIRECT EVIDENCE OF DISCRIMINATION IN THE INDUSTRY EXISTS. ..........5
    B.    THE WILSON DISPARITY STUDY ................................................6

VI.    THE DAUBERT STANDARDS REQUIRE EXCLUSION OF THE
       WILSON STUDY .....................................................................7

    A.    THE LEGAL STANDARDS...........................................................7
    B.    BACKGROUND OF D. WILSON DISPARITY STUDY ........................9
    C.    THE D. WILSON STUDY LACKS RELIABILITY AND IS INADMISSIBLE. ..........11
        1.   The D. Wilson study failed to utilize the required and acceptable
            methodology to determine availability of ready, willing and able
            DBEs...........................................................................11
        2.   The Wilson study did not include the required methodology.............12
    D.    THE MDT QUESTIONED THE ACCURACY AND RELIABILITY OF THE WILSON
          STUDY...............................................................................13
    E.    THE THEORY AND TECHNIQUE UTILIZED BY THE D. WILSON STUDY DOES
          NOT ENJOY GENERAL ACCEPTANCE WITHIN THE RELEVANT SCIENTIFIC
          COMMUNITY. ....................................................................14
    F.    THE WILSON STUDY CANNOT BE TESTED OR REPLICATED.........................19

VII.   THE STATE'S FAILURE TO UTILIZE APPROPRIATE AND
       ACCEPTABLE METHODS OF DETERMINING AVAILABILITY ...........20

VIII.  THE STATE'S REASON FOR IMPOSING RACE BASED PREFERENCES
       IS INVALID.............................................................................20

IX.   THE TESTIMONY OF MS. KYLE REGARDING THE AVAILABILITY ANALYSIS IN THE D. WILSON STUDY IS NOT ADMISSIBLE. ............21

X.   NARROW TAILORING ...................................................................22

XI.   DAMAGES ...................................................................................23

CERTIFICATE OF COMPLIANCE - L.R. CR 7.1(D)(2)(E) ................................26

CERTIFICATE OF SERVICE ..............................................................................27

# TABLE OF AUTHORITIES

## Cases

*Adarand v. Pena,*
  515 U.S. 200, 214 (1995).............................................................................. passim
*Alexander v. Choate,*
  469 U.S. 287, 292-93 (1985) ................................................................3
*Alexander v. Sandoval,*
  532 U.S. 275, 281 (2001)......................................................................1
*Chalmers v. City of Los Angeles,*
  762 F.2d 753, 759-60 (9th Cir. 1985).................................................23
*City of Richmond v. Croson,*
  *488 U.S. 469, 493 (1989)* ............................................................ 4, 6, 22
*Consolidated Rail v. Darrone,*
  465 U.S. 624, 630-31 (1984) ...............................................................23
*Daubert v. Merrel Dow Pharma.* ("*Daubert II*")
  43 F.3d 1311, 1318 (9th Cir. 1995) ......................................................9
*Daubert v. Merrell Dow,*
  509 U.S. 597 (1993)................................................................... 7, 8, 18
*Davita v. Columbia/HCA,*
  241 F.3d 1131 (9th Cir. 2001) ..............................................................3
*DSPT v. Nahum,*
  624 F.3d 1213, 1223 (9th Cir. 2010) ..................................................23
*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970, 982 (9th Cir. 2011) ........................................................8
*Fisher v. Univ. of Texas,*
  570 U.S. 297, 133 St. Ct. 2411, 2419 (2013) ..................................2, 22
*Fobbs v. Holy Cross Health Sys.,*
  29 F.3d 1439, 1447 (9th Cir. 1994) ......................................................3
*Franklin v. Gwinnett,*
  503 U.S. at 60, 72-73 (1990) ..............................................................23
*Gratz v. Bollinger,*
  539 U.S. 244, 275 (2003)......................................................................1
*Grutter v. Bollinger,*
  539 U.S. 306, 326 (2003).............................................................. 2, 5, 22

*Guardians Ass'n v. Civil Service Commission*,
   463 U.S. 582, 607-08 (1983) ..................................................................3

*Hassen v. City of New York*,
   804 F.3d 277, 295 (3rd Cir. 2015) ..........................................................4

*Hirabayashi v. U.S.*,
   320 U.S. 81, 100 (1943)..........................................................................1

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 152-53 (1999) ......................................................... 7, 8, 9

*Lee v. Kanz*,
   270 Mont. 505, 510 (1995) .....................................................................24

*Massarsky v. GM*,
   706 F.2d 111, 128 (3rd Cir. 1983) ............................................................4

*Matelich v. Goodfellow Brothers*,
   198 Mont. 150, 153 (1982) .....................................................................23

*McFarland v. Welch*,
   48 Mont. 196, 198 (1913) .......................................................................23

*Miller v. Johnson*,
   515 U.S. 900, 904-05 (1995) ....................................................................4

*Monterey Mechanical v. Wilson*,
   125 F.3d 702, 707-08 (9th Cir. 1997)........................................................5

*Mountain West Holding Co. v. Montana*,
691 Fed. Appx. 326, 329 (2017)…………………………………………3

*Parents Involved in Cmty. Schools v. Seattle School District No. 1*,
   551 U.S. 701, 720 (2007)........................................................................22

*Peterson v. City of Greenville*,
   373 U.S. 244, 248, 83 S.Ct. 1119, 1121, 10 L.Ed.2d 323 (1963) ..........5

*Primiano v. Cook*,
   598 F.3d 558, 564 (9th Cir. 2010) ............................................................7

*Rashdan v. Geissberger*,
   764 F.3d 1179, 1183 (9th Cir. 2014) ........................................................3

*Regents of Union Calif. v. Bakke*,
   439 U.S. 265, 289 (1978)..........................................................................1

*Rothe v. Dept. of Defense*,
   545 F.3d 1023, 1047 (Fed. Cir. 2008) ......................................................2

*Sebena v. AAA*, 280 Mont.
   305, 310 (1996)......................................................................................24

*Shaw v. Reno*,

509 U.S. 630, 644 (1993)..............................................................2

*Tractor & Equip. Co. v. Zerbe Bros.*,
  348 Mont. 30, 41 (2008) ...................................................24
*U.S. v. Virginia*,
  518 U.S. 515, 533 (1996).............................................2, 3
*United States v. Paradise*,
  480 U.S. at 149, 171 (1987).............................................22
*Western States Paving v. WSDOT*,
  407 F.3d 983, 990 (9th Cir. 2005) ......................... passim
*WH Scott Construction Co. v. City of Jackson*,
  199 F.3d 206, 219-20 (5th Cir. 1999)..............................23
*Williams v. City of Dothan*,
  745 F.2d 1406, 1414 (11th Cir. 1984) .............................4
*Wittmer v. Peters*,
  904 F. Supp 845, 849-50 (C.D. Ill. 1995) Aff'd 87 F.3d 916 (7th Cir. 1996) .......4
*Yick Wo. V. Hopkins*,
  118 U.S. 356, 374 (1986)..................................................1

**Statutes**

29 U.S.C. § 2000d..............................................................1

**Rules**

Fed. R. Evid. 602 ..............................................................21
Fed. R. Evid. 702 ..............................................................7

# I.    INTRODUCTION

This case presents the question of when, if ever, can a state impose race based preferences in highway construction contracts. It is also a case involving racial discrimination. Because racial preferences are a factor in the State's program, Title VI of the Civil Rights Act, 29 U.S.C. § 2000d is implicated. That Act provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, or denied benefits of, or subjected to discrimination under any activity receiving federal financial assistance.
>
> 29 U.S.C. § 2000d

The lawsuit also implicates the Equal Protection Clause of the United States Constitution because of a violation of the Equal Protection Clause is also a violation of Title VI. *Gratz v. Bollinger*, 539 U.S. 244, 275 (2003); *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001).

It also must be remembered the Supreme Court has long and consistently held that "distinctions between citizens solely because of their ancestry are by their very nature odious to a free people." *Regents of Union Calif. v. Bakke*, 439 U.S. 265, 289 (1978); *Adarand v. Pena*, 515 U.S. 200, 214 (1995); *Hirabayashi v. U.S.*, 320 U.S. 81, 100 (1943); *Yick Wo. V. Hopkins*, 118 U.S. 356, 374 (1986). Such classifications are "inherently suspect" and "presumptively invalid". *Fisher v.*

*Univ. of Texas*, 570 U.S. 297, 133 St. Ct. 2411, 2419 (2013); *Shaw v. Reno*, 509 U.S. 630, 644 (1993).

This case is different because the ultimate burden of justifying the use of racial classifications "…is demanding and rests **entirely** on the state". *U.S. v. Virginia*, 518 U.S. 515, 533 (1996); *Western States Paving v. WSDOT*, 407 F.3d 983, 990 (9th Cir. 2005) [emphasis added].

"Strict scrutiny," a "detailed, skeptical, non-differential analysis is required" by the court. *Rothe v. Dept. of Defense*, 545 F.3d 1023, 1047 (Fed. Cir. 2008). Racial classifications can be upheld **only** in the most "extreme case" in there is a "strong basis in evidence" which shows a deliberate pattern of exclusions", *Croson*, 448 U.S. at 509.

## II.     THE DBE PROGRAM IS "PRESUMPTIVELY INVALID"

This case is somewhat unusual in that the court must presume the Montana DBE program is invalid. *Adarand*, 515 U.S. at 223-24; *Grutter*, 539 U.S. at 326. The burden of justifying the DBE program is "exacting" and rests **entirely** with the state. *Western States*, 407 F.3d at 990, *Adarand*, 515 U.S. at 224.

## III.    TITLE VI: THE REQUIRED PROOF AND ANALYSIS

### A. The Elements of Proof

To establish a claim under Title VI a plaintiff must allege and prove (1) the MDT received federal assistance and (2) engaged in discrimination on a prohibited

ground. *Fobbs v. Holy Cross Health Sys.*, 29 F.3d 1439, 1447 (9th Cir. 1994), overruled on other grounds *Davita v. Columbia/HCA*, 241 F.3d 1131 (9th Cir. 2001).

## B. The Prima Facie Case

The degree of proof necessary to establish a prima facie case is minimal and does not even need to rise to the level of a preponderance of the evidence. *Rashdan v. Geissberger*, 764 F.3d 1179, 1183 (9th Cir. 2014). Here it is undisputed that MDT received federal funds and established classifications that gave a preference based upon race.[1] The prima facie case has been established.

## C. The burden of justification of the use of racial classifications upon the State.

Once MDT establishes a prima facie case, that MDT established and utilized racial classifications, the burden shifts to MDT to "justify" the use of racial classifications. That burden is "demanding" and rests **entirely** on the state. *U.S. v. Virginia*, 518 U.S. at 531; *Western States*, 407 F.3d at 990 [emphasis added]. Thus the burden of proof and persuasion is **entirely** on the state to justify the use of race based preferences.

## IV. PROOF OF INTENT

---

[1] The Ninth Circuit in its memorandum opinion noted "Montana does not dispute that its program took race into account". *Mountain West Holding Co. v. Montana*, 691 Fed. Appx. 326, 329 (2017)

Title VI bars intentional discrimination. See *Guardians Ass'n v. Civil Service Commission*, 463 U.S. 582, 607-08 (1983); *Alexander v. Choate*, 469 U.S. 287, 292-93 (1985). Intentional discrimination occurs when the recipient acted, at least in part, because of the actual or perceived race, color, or national origin of those who were subject to the discriminatory treatment. *Doe v. Lower Marion School Dist.*, 665 F.3d 524, 548 (3rd Cir. 2011). Some assume that the intentional use of race should be carefully scrutinized only when the intent is to harm a group or individual defined by race, color, or national origin. That is not true; the Supreme Court in *Croson, 488 U.S. at 493* and *Adarand Contractors*, 515 U.S. at 226 established that any intentional use of race, whether for malicious or benign motives is subject to most careful and strict judicial scrutiny. Accordingly, the record need not contain evidence of "bad faith, ill will or any evil motive on the part of the [recipient]". *Williams v. City of Dothan*, 745 F.2d 1406, 1414 (11th Cir. 1984).

A recipient's express or admitted use of classifications based upon race, color, or national origin establishes intent without regard to the decision maker's animus or ultimate objective. **Such classifications demonstrate a discriminatory purpose as a matter of law**. *Miller v. Johnson*, 515 U.S. 900, 904-05 (1995); *Wittmer v. Peters,* 904 F. Supp 845, 849-50 (C.D. Ill. 1995) Aff'd 87 F.3d 916 (7th Cir. 1996) **"put another way, direct evidence of intent is 'supplied by the policy**

**itself"'** *Hassen v. City of New York*, 804 F.3d 277, 295 (3rd Cir. 2015) (quoting *Massarsky v. GM*, 706 F.2d 111, 128 (3rd Cir. 1983)).

The focus is on how the recipient's actions specifically deprived or otherwise adversely affected the individual or individuals of access to a federally funded program or benefit. Even benign motivations for racial classifications are "presumptively invalid". *Adarand*, 515 U.S. at 223-24; *Grutter*, 539 U.S. at 326.

> The principle that ethnic discrimination is wrong is what makes discrimination against groups of which we are not members wrong, and by the principle, discrimination is wrong even if the beneficiaries are members of groups whose fortunes we would like to advance. The person required by government to engage in discrimination suffers injury in fact, albeit of a different kind, as does the person suffering the discrimination. A "law compelling persons to discriminate against other person because of race" is a "palpable violation of the Fourteenth Amendment," regardless of whether the persons required to discriminate would have acted the same way regardless of the law. *Peterson v. City of Greenville,* 373 U.S. 244, 248, 83 S.Ct. 1119, 1121, 10 L.Ed.2d 323 (1963); *Monterey Mechanical v. Wilson*, 125 F.3d 702, 707-08 (9th Cir. 1997).

## V. THE REQUIRED PROOF TO JUSTIFY RACE BASED PREFERENCES

To justify the use of race based preferences the state must prove (1) the existence of discrimination in its highway contracting program (or its lingering effects) and (2) that the DBE program is narrowly tailored. *Western States*, supra.

### A. No direct evidence of discrimination in the industry exists.

Here, MDT has no direct evidence of discrimination. Through discovery the state has conceded that (1) there are no judicial, administrative, or legislative

findings of discrimination; (2) the state has never discriminated in the award of a contract; (3) the state is not aware of any general contractor who discriminated in the award of a subcontract.

### B. The Wilson Disparity Study

Lacking direct evidence of discrimination the state commissioned a disparity study by the D. Wilson Consulting Group. The purpose of such study is to determine whether there is a disparity between the availability and utilization of minorities. *Croson* held that if there is a "significant disparity" between ready, willing, and able DBE contractors and utilization an inference of discrimination "could" arise. 488 U.S. at 509

The Wilson study recommended:

The Montana Department of Transportation (MDT) should continue operating in a race-neutral environment and implement a small business program. In the area of construction, the availability of DBEs is so low that MDT should focus on assisting DBE businesses to increase capacity; and, identify new DBE businesses to participate in its program. The construction program should be monitored carefully to ensure that the DBE firms continue to participate at their levels of availability. If the utilization rates decrease below availability, the MDT should consider implementing race-conscious measure for the DBE groups affected.

However, there are significant difficulties with that study and questions whether the study is reliable and admissible.

/

## VI.  THE DAUBERT STANDARDS REQUIRE EXCLUSION OF THE WILSON STUDY

### A. The Legal Standards

Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This Rule assigns to the court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597. Under *Daubert*, a trial court faced with a proffer of expert testimony

> Must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592-93. These factors are not exclusive and should be applied as relevant to the particular case at hand. *Kumho*, 526 U.S. at 152-53. *See also Daubert*, 509 U.S. at 591 (the theory must "fit" the facts of the case, *i.e.*, be relevant).

This "gatekeeping" function applies to all expert testimony proffered under Rule 702. *Kumho Tire Co*, 516 U.S. at 149 (1999) (extending *Daubert's* holding on scientific expert testimony to all expert testimony). See also *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("…applies not only to scientific testimony but to all expert testimony"). It is the district court's duty to "act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

*Daubert's* gatekeeping function has been distilled into two inquiries: (1) whether the expert's proffered testimony has a "reliable basis in the knowledge and experience" of the expert's discipline and (2) whether the proposed testimony or evidence "is sufficiently 'relevant to the task at hand.'" *Id*. at *Ellis,* 657 F.3d at 1120-21 (quoting *Daubert*, 409 U.S. at 592, 597).

The objective "is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152.

The reliability threshold requires that the expert's testimony have "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co., Ltd.,* 526 U.S. at 149. The court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at

592-93. To aid courts in exercising this gatekeeping role, the Supreme Court has suggested a non-exclusive and flexible list of factors that a court may consider when determining the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592-94. Thus the Federal Rule of Evidence 702 as explicated by the *Daubert* line of cases requires that to be admissible, expert testimony must be based upon sufficient facts and data and apply the principles and methods reliably to those facts. Without such safeguards the analysis is merely the "ipse dixit of the expert." *Kumho Tire Co.,* 526 U.S. at 141. "The test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Cabrera*, 134 F.3d at 1421 quoting *Daubert v. Merrel Dow Pharma.* ("*Daubert II*") 43 F.3d 1311, 1318 (9th Cir. 1995).

## B. Background of D. Wilson Disparity Study

The Montana Department of Transportation engaged the D. Wilson Consulting Group LLC to conduct an "availability and disparity study." The study was completed in August 2009 and revised in January 2010. The study covered the period of October 1, 1999 through September 30, 2006 (FY 2000 – FY 2006). The

stated purpose or "primary objectives" of the study were to "identify and characterize":

- The extent to which Disadvantaged Businesses participate in the procurement of federally funded highway, airports and transit contracts within Montana.

- Whether DBE participation is representative of the availability of minority and women owned businesses ready, willing and able to participate in the federally funded State contracts within Montana.

- Whether discrimination exists and if found, its identification by DOT modal group as well as individually, by race, ethnicity and gender of all groups affected.

- Presumed disadvantaged groups that are over or underutilized on federally assisted State contracts based upon their availability.

- The magnitude of differences between DBE availability (based on capacity) and DBE participation on federally assisted State contracts.

The study identified in its "methodology" that it had

> reviewed and analyzed the impact of relevant court decisions…including…*Western States Paving v. Washington Department of Transportation.* It also "reviewed federal and state statutes, regulations, policies and procedures that impacted the DBE program…

Ms. Deirdre Kyle was the sole member of the D. Wilson Consulting Group LLC.

Ms. Kyle had a Bachelor of Science degree in Political Science and an Associate's

Degree in General Education. She conducted no research to obtain either degree.

Although the D. Wilson consulting group had some 5-6 employees at the time the

MDT study was conducted, she also used consultants. Mr. Jeff Ling of Evergreen

Consulting was responsible for the availability analysis. However, Ling did not

determine availability it was Mr. Ling's staff who wrote the availability analysis.

(Ling 44:14-15).

### C. The D. Wilson Study lacks reliability and is inadmissible.

#### 1. The D. Wilson study failed to utilize the required and acceptable methodology to determine availability of ready, willing and able DBEs.

##### a. The required methodology.

In *Western States Paving* the court was clear that in determining availability

the state is required to account and control for factors other than race that may

affect the capacity of DBEs to undertake contracting work. 407 F.3d at 999. The

court noted there are many reasons DBE firms may not be available: "DBE firms

may be smaller and less experienced"…"may be contracted in certain geographical

areas rendering them unavailable for a disproportionate amount of work"…"it does

not account for the relative size of the firms, either in terms of ability to do

particular work or in terms of the number of tasks they have resources to

11

complete"…"minority firms may not have bid on construction contracts because they were generally small companies incapable of taking on large projects, or they may have been fully occupied on other projects, or the…contracts may not have been as lucrative." 407 F.3d at 1001. The *Western States* court found the state's statistical evidence lacking because "the states statistical evidence controls for none of these factors." 407 F.3d at 1001.

The USDOT issued guidance to the states following the *Western States* decision in which it emphasized that a disparity study:

> …should rigorously determine the effects of factors other than discrimination that may account for statistical disparities between DBE availability and participation. This is likely to require a multi-variate regression analysis.
>
> Doc. 45-2 p.15

## 2. The Wilson study did not include the required methodology.

A review of the D. Wilson study shows that no multi-variate regression analysis appears in the study.[2] MDT admitted that a multi-variate regression analysis was not used. (Ex. 101 RTA 17). The author of the D. Wilson study was Ms. Deirdre Kyle. Ms. Kyle assigned and relied upon Mr. Ling to determine availability. (Kyle 23:3-5). She strangely asserted that she checked Ling's work for accuracy (Kyle 23:10-11) but did nothing to determine if the methodology used

---

[2] The words "regression analysis" appears in a parenthetical expression at page 4-3 and references Appendix C. – however there is no Appendix C in the document.

was correct. (Kyle 23:13-14)[3]. Simply, Ms. Kyle had no reasonable knowledge or information whether the availability figures had been adjusted for factors other than race.

### D. The MDT questioned the accuracy and reliability of the Wilson study.

Ms. Sheila Cozzie was the MDT Civil Rights Bureau Chief and responsible for the DBE program. (Cozzie 7:2-12). Ms. Cozzie questioned the Wilson study's determination that there were 6,928 firms ready, willing and able to do work in Montana and believed the number was high. (Cozzie 23:16; 24:5; 18-19). She spoke with others, including the Director of MDT and all agreed that the number was high. (Cozzie 25:4-19).

The correspondence between MDT and D. Kyle of the Wilson group confirms the concerns of MDT that the information provided by Wilson was not accurate. Among other concerns was the emails asking "what assurances do we have that these numbers are correct? Why have the numbers changed so significantly?" (Ex. 114). Further explaining the concerns MDT pointed out "I'm still concerned as to how we went from 1,337 construction firms in the draft to 5,813 construction firms today with other numbers in between," "Now we have yet another number for availability. I have never seen the 4,913 number before the

---

[3] All Ms. Kyle could relate about the calculation of availability was "I can tell you how the data was collected. You will have to talk to Dr. Ling about how it was calculated." (Kyle 41:16-18).

email. So frustrating…" (Ex. 114). "How can we be sure the numbers you provide are correct?" (Ex. 114).

The ever changing numbers and expressed doubts and concerns of MDT lend to the conclusion that the Wilson study lacks the reliability required.

### E. The theory and technique utilized by the D. Wilson study does not enjoy general acceptance within the relevant scientific community.

The acceptable methodology must include a determination of availability that takes into account factors other than race. It is undisputed the Wilson study did not account for those factors and as a result cannot be accepted within the "relevant scientific community".

However, there are more deficiencies in the Wilson study that demonstrate the failure to follow recognized techniques and methodology. These deficiencies are identified in the report of Dr. LaNoue (Ex. 56) and his testimony:

- The study starts with the "universe of all contractors that could perform the work of 3,789 firms, which was, without explanation, increased to 6,591 firms. Ex 3; Compare Table 4-1 p.4-5 to Table 4-3 p.4-6 and 4-5 p.4-8; Ex 16: Dep. Ling pp. 58. (No explanation has ever been offered).

- The study lists 2 Black American subcontractors and 5 Black Americans in professional services. Somehow the sum of those

numbers became 13. (Table 4-5). Ex 3 Table 4-5. (Failure to follow basic principles of math).

- Anecdotal samples were few in number and were neither random nor stratified. PSMF 15(g).

- The responses to the telephone surveys were so low as to render the sampling meaningless. PSMF 15(f)-(i).

- Anecdotal samples were self-selected and not verified for accuracy. PSMF 15(k).

- Those responsible for the Disparity Study had no idea of how capacity was determined or how availability was weighted. Ex 16: Dep. Ling 65-66; Ex 15: Dep. Kyle 41.

- Dr. Ling did not write the availability chapter as Ms. Kyle claimed. Nor could he answer many of the questions about the availability calculations, she said he would have responsibility for. Good social science requires researchers to understand their data sources and the methods used to statistically analyze it. Without that information, it is not possible for anyone else to replicate a study's conclusions or determine its accuracy. p.20.

- These lists yielded a "master data base" of 3,789 firms. (Table 4-1, p.4-5). There is no information in the study about what proportion of

firms in the master data base came from which source and Ling didn't know (Ling p.50-51). This is information which good social science would require. p.17.

- The Wilson study properly recognized that this data base was only a head count (p.4-3), so it moved to create a "subset of qualified willing and able firms from the overall pool of firms." (p.4-3). This is a key step, but Wilson's methodology for creating this subset is only partially discernible from the text of the report and Mr. Ling could not explain it. Some flaws in the study's methodology, however, are obvious. p.27.

- The Wilson study asserts that the key assumptions in the filtering processes were that the "business survey respondents were representative of the firms in the overall data base therefore patterns of revenue generation and business patterns were similar to those of firms in the master data vendor data base." (p.4-4). Whether those assumptions were correct depends on whether the study had a non-response or response bias problem or whether, in fact, the responses were representative of the larger data base. A non-response bias occurs when substantial number of those surveyed refuses to participate. A response bias problem occurs when those who do

participate are not representative of the larger sample. It appears that the Wilson study encountered both problems. P.28.

- After analyzing the results of its telephone survey, Wilson altered the raw numbers it found in Montana from 3,789 firms (Table 1, p.4-5) to an "adjusted" availability number of 6,591 firms (Tables 4-3, p.4-6 and Table 4-5, p.4-8). How Wilson made this adjustment is not clear form the study documents and could not be explained by Kyle or Ling in their depositions. Are the adjusted firms a mathematical projection or do they constitute a list of real firms? If a firm did not respond to the telephone survey, was it still considered available? If a surveyed firm said it was not interested in MDT work, was it dropped from the adjusted list? If a firm indicated that it bid 20 times, was it counted as equally available to firms that bid only one? Were firms that bid only on contracts worth $50,000 or less counted as equally available to firms that bid multi-million dollar contracts? Good social science requires answers to all these questions, but neither the text of the study nor depositions with Ms. Kyle and Mr. Ling could provide answers. P.30.

- The Wilson study violates one of the first rules of social science that statistical calculations should be transparent and replicable.[4] P.46.

- Neither the Wilson researchers nor the State has verified any of the anecdotal allegations made in the study. (Kyle, p.72-73 and Ling, p.71). In its April 11, 2014 admissions, the state admitted that it did know which firms provided the anecdotes in the Wilson study (MWHC Ex. 122 RTA 20). Neither the Wilson group nor the State saw any of the actual interview responses summarized in the study. (MWHC Ex. 122 RTA 24, 23). The State has never been provided with the transcripts of any interviews reported in the study (MWHC Ex. 122 RTA 24) and did not verify any of the anecdotal claims in the Wilson study to know whether they are accurate and true. (MWHC Ex. 122 RTA 21). No claim was ever investigated; even the four interviewees that stated MDT discriminated against them. P.63.

In summary, the anecdotal section of the Wilson study does not meet social science research standards and it is not helpful in documenting actual instances of discrimination or devising remedies.

---

[4] See for example, American Educational Research Association, "Standards for Reporting Empirical Social Science Research in AERA Publications." *Educational Researcher,* Vol. 35, No.6, pp, 33-40. "Two overarching principles underlie the development of these reporting standards; the sufficiency of the warrants [adequate evidence to justify results and conclusions] and the transparency of the report." (p.33).

The assertions of Dr. LaNoue that the Wilson study did not meet acceptable social science standards remains undisputed. The Wilson study does not meet the *Daubert* requirements.

### F. The Wilson study cannot be tested or replicated.

*Daubert* suggests the court consider "whether a theory or technique can be tested." 509 U.S. at 592-94. Here because of the deficiencies noted above, the Wilson report cannot be tested or replicated. As Dr. Lanoue wrote in his report:

> Dr. Ling did not write the availability chapter as Ms. Kyle claimed. Nor could he answer many of the questions about the availability calculations, she said he would have responsibility for. Good social science requires researchers to understand their data sources and the methods used to statistically analyze it. Without that information, it is not possible for anyone else to replicate a study's conclusions or determine its accuracy.
>
> p.29
>
> First, it has to determine availability by distinguishing qualified, willing and able firms from those that are not and then weigh those relative characteristics for the firms considered minimally available. If that is not done, there is no way to determine whether a disparity is caused by differences in the qualifications, willingness and ability of firms belonging to certain groups or to racial and gender discrimination. A firm might be very willing, but not have the qualifications or ability to perform of the MDT contracts being awarded. According to the text of the Wilson study, it may have attempted to do that, but neither the text Ms. Kyle or Mr. Ling could explain how it was done. There is no way to scientifically replicate or determine the accuracy of the study's calculations.
>
> P.78-79

As Dr. Lanoue testified in his deposition:

Q: So you did not attempt to replicate the D. Wilson methodology…

A. I don't know how anyone could since the methodology is not clear.

LaNoue 65:13-16

That testimony and report by Dr. LaNoue remains undisputed and unchallenged.

The court should find the D. Wilson study and testimony regarding the study is inadmissible.

## VII. THE STATE'S FAILURE TO UTILIZE APPROPRIATE AND ACCEPTABLE METHODS OF DETERMINING AVAILABILITY

It is clear and undisputed that both *Western States* and the USDOT guidance memorandum require the state to account for factors other than race in determining availability. Those factors will include size, capacity, experience, financing, and location **to determine** those who are "ready, willing, and able".

The evidence shows that neither the Wilson study nor the state using the DBE suite controlled for such factors. As such, the State's availability determinations are false, unreliable and inflate the availability.

## VIII. THE STATE'S REASON FOR IMPOSING RACE BASED PREFERENCES IS INVALID

The stated reason for MDT's imposition of race based preferences was that the DBE utilization was declining. However, the state conceded that it had no evidence the decrease was the result of discrimination. (Dep. Stewart).

The State ignored the guidance of Western States and the USDOT memorandum which provided:

> a decline in DBE participation after race- and gender- based preferences are halted is not necessarily evidence of discrimination against DBEs. *See* 407 F.3d at 999 ("If [minority groups have not suffered from discrimination], then the DBE program provides minorities who have not encountered discriminatory barriers with an unconstitutional competitive advantage at the expense of both non-minorities and any minority groups that have actually been targeted for discrimination."); *id.* at 1001 ("The disparity between the proportion of DBE performance on contracts that include affirmative action components and on those without such provisions does not provide any evidence of discrimination against DBEs."); *see also* U.S. Dep't of Transp., Western States Paving Co. Case Q&A (Dec. 16, 2014) ("In calculating availability of DBEs, [a state's] study should not rely on numbers that may have been inflated by race-conscious programs that may not have been narrowly tailored.").
>
> Ex. 58

## IX. THE TESTIMONY OF MS. KYLE REGARDING THE AVAILABILITY ANALYSIS IN THE D. WILSON STUDY IS NOT ADMISSIBLE.

Fed. R. Evid. 602 provides:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence may consist of the witness own testimony. This rule does not apply to a witness expert testimony under Rule 703.

Here MDT will call Ms. Deidra Kyle of the D. Wilson Consulting Group to testify about the disparity study. Ms. Kyle was not designated by MDT as an expert witness and as a result her testimony is governed by Rule 602 which requires personal knowledge.

The Wilson disparity study includes a Chapter 4 in which "availability" of DBEs is determined. In deposition testimony Ms. Kyle testified that she did not determine availability, that determination was subcontracted to Mr. Ling of Evergreen Consulting. In deposition testimony Ms. Kyle had no knowledge of availability and continually deferred the questions to Mr. Ling.

Having no personal knowledge, Ms. Kyle is not competent to testify regarding the availability analysis.

## X.    NARROW TAILORING

If the MDT establishes the existence of discrimination in the state highway construction industry the (which it cannot do) MDT must still demonstrate that it has satisfied "narrow tailoring," that it is using race in the most limited manner that will still allow it to accomplish its objective. *Parents Involved in Cmty. Schools v. Seattle School District No. 1*, 551 U.S. 701, 720 (2007). "Even in the limited circumstance when drawing racial distinctions is permissible…[the recipient] is still constrained in how it may pursue that end." *Grutter*, 539 U.S. at 333. The court must be ultimately satisfied that no workable race neutral alternatives would suffice. *Fisher v. University of Texas*, 133 S.Ct. 2411, 2420 (2013).

Six factors are considered in the narrow tailoring analysis: (1) the necessity of relief; (2) the efficacy of alternative, race-neutral remedies; (3) the flexibility of relief, including the availability of waiver provisions; (4) the relationship of the

stated numerical goals to the relevant labor market; (5) the impact of relief on the rights of third parties; and (6) the overinclusiveness of the or underinclusiveness of the racial classification. *United States v. Paradise*, 480 U.S. at 149, 171 (1987); *Croson*, 488 U.S. at 506; *Adarand*, 515 U.S. at 238-39 (noting that the lower court on remand should consider whether the legislative body had tried race-neutral alternatives and whether the program was limited in duration. *Western States*, 407 F.3d at 993.

Again, the burden to justify the use of racial preferences is "entirely" on the state and the state must demonstrate that each of the six factors were met **before** racial preferences were imposed.

## XI.    DAMAGES

The Supreme Court has ruled that monetary damages are an available remedy in private actions brought to enforce Title VI. *Franklin v. Gwinnett*, 503 U.S. at 60, 72-73 (1990); *Consolidated Rail v. Darrone*, 465 U.S. 624, 630-31 (1984). *WH Scott Construction Co. v. City of Jackson*, 199 F.3d 206, 219-20 (5th Cir. 1999) involved a challenge to a municipal minority business enterprise program. The Fifth Circuit affirmed an award by the district court for lost profits to a non-minority contractor because the contractors bid had been "rejected for failure to comply with" the program. Similarly, in *Chalmers v. City of Los Angeles*, 762 F.2d 753, 759-60 (9th Cir. 1985) a street vendor was prevented from conducting

business due to conflicting ordinances which denied her due process. The Ninth Circuit held that to make the vendor whole compensatory damages could be based on the vendor's initial set up costs plus net profits. A defendant whose wrongful conduct has rendered difficult the determination of precise damages suffered by the plaintiff is not entitled to complain that damages cannot be measured with exactness and precision. *DSPT v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010). The Montana courts have held that exact proof of damage is not necessary. *Matelich v. Goodfellow Brothers*, 198 Mont. 150, 153 (1982). There must be some evidence from which the amount may be determined. *McFarland v. Welch*, 48 Mont. 196, 198 (1913). Expert testimony is not required to prove lost profits. *Lee v. Kanz*, 270 Mont. 505, 510 (1995). The Montana Supreme Court has set forth the following standards for determining damages:

> Damages for loss of profits may be awarded if not speculative. The rule that prohibits speculative profits does not apply to uncertainty as to the amount of such profits but to uncertainty or speculation as to whether the loss of profits is the result of the wrong and whether such profit would have been derived at all. Once liability is shown, that is the certainty that the damages are caused by the breach, then loss of profits on a reasonable basis for computation and the best evidence available under the circumstances will support a reasonably close estimate of the loss…
> *Sebena v. AAA*, 280 Mont. 305, 310 (1996)

"Mathematical precision" is not required…proof of damages must consist of a reasonable basis for computation and the best evidence under the circumstances which will enable a judge to arrive at a reasonably close estimate of the loss.

*Tractor & Equip. Co. v. Zerbe Bros.*, 348 Mont. 30, 41 (2008) quoting in Re *Mease,* 320 Mont. 229 (2004).

DATED this 20th day of February, 2018.

PARKER, HEITZ & COSGROVE, PLLC

*/s/ Casey Heitz*

Casey Heitz
Attorneys for Plaintiff,
Mountain West Holding Co., Inc.

MEYER, FLUEGGE & TENNEY, P.S.

*/s/ Gary E. Lofland*

Gary E. Lofland
Attorneys for Plaintiff,
Mountain West Holding Co., Inc.

**Certificate of Compliance - L.R. CR 7.1(d)(2)(E)**

On this day, the undersigned in Yakima, Washington, used a word count of the word-processing system that was used to prepare this brief in order to determine that the number of words in this document (excluding caption, certificates of service and compliance, table of contents and authorities, and exhibit index) was 5,583.  I certify under penalty of perjury that the foregoing is true and correct.

| | |
|---|---|
| February  20, 2018 | /s/  *Gary E. Lofland* |
| DATE | Gary E. Lofland |

# CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February, 2018, I electronically filed the foregoing document entitled *Mountain West Holding Company's Trial Brief* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David L. Ohler:  dohler@mt.gov

Val Wilson:  valwilson@mt.gov

Casey Heitz:  caseyheitz@parker-law.com

Mark D. Parker:  markdparker@parker-law.com

MEYER, FLUEGGE & TENNEY, P.S.
*/s/ Gary E. Lofland*
Gary E. Lofland
Attorneys for Plaintiff,
Mountain West Holding Co., Inc.