Gary Lofland
MEYER, FLUEGGE & TENNEY
230 South Second Street
PO Box 22680
Yakima, WA 98907
Telephone: (509) 452-2828
Facsimile: (509) 452-2858
E-mail: glofland@glofland.net

Mark D. Parker
Casey Heitz
PARKER, HEITZ & COSGROVE, PLLC
401 North 31st Street, Suite 805
P.O. Box 7212
Billings, MT 59103-7212
Telephone: (406) 245-9991
Facsimile: (406) 245-0971
E-mail: markdparker@parker-law.com
        caseyheitz@parker-law.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

_____

| | | |
|---|---|---|
| MOUNTAIN WEST HOLDING CO., INC., | ) ) ) | Cause No. CV-13-49-BLG |
| Plaintiff, | ) ) | |
| v. | ) ) | PLAINTIFF MWHC'S PROPOSED FINDING OF |
| STATE OF MONTANA; MONTANA DEPARTMENT OF TRANSPORTATION, | ) ) ) ) | FACTS AND CONCLUSIONS OF LAW |
| Defendants. | ) ) | |

_____

The Court based upon the evidence received at trial and the Ninth Circuit Court of Appeal's Memorandum makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Mountain West Holding Co. Inc. ("MWHC") is a corporation organized under the laws of the State of Montana.

    Doc. 13: Amended Complaint p.2 ¶ 1.1

2. MWHC is a highway construction contractor that provides construction specific planning and staffing for highway construction projects and also installs signs, guard rails, and concrete barriers.

    Doc 13: Amended Complaint p.4 ¶ 4.1
    Doc 15: Answer p.4 ¶ 4.1

3. MWHC is owned and controlled by white males.

    Doc 13: Amended Complaint p.4 ¶ 4.2
    Doc 52-4: Stipulation

4. MWHC is not a disadvantaged business enterprise (DBE) and would not be entitled to the presumption of social disadvantage afforded companies owned by minorities and women.

    Doc 13: Amended Complaint p.4 ¶ 4.3
    Doc 52-4: Stipulation

5. MWHC's competitors are DBEs – women and minority owned firms.

    Doc. 45-6 p.2: Stmt. Connors ¶3,4.

6. The State of Montana is a government entity.

> Doc 13: Amended Complaint p.2 ¶ 1.2
> Doc 15: Answer p.2 ¶1.2

7. The Montana Department of Transportation ("MDT") is a department and administrative agency of the State of Montana.

> Doc 13: Amended Complaint p.2 ¶ 1.3
> Doc 15: Answer p.2 ¶ 1.3

8. Michael Tooley is the Director of MDT.

> Doc 13: Amended Complaint p.2 ¶ 1.4
> Doc 15: Answer p.2 ¶ 1.4

9. Patti McCubbins is MDT's Civil Rights Bureau Chief and DBE Liaison Officer.

> Doc 13: Amended Complaint p.2 ¶ 1.5
> Doc 15: Answer p.2 ¶ 1.5

10. MDT receives and administers federal funds from the US Department of Transportation (USDOT) and the Federal Highway Administration (FHWA) for the planning, design, construction and repairs of roads and highway.

> Doc 13: Amended Complaint p.4 ¶ 4.4
> Doc 15: Answer p.4 ¶ 4.4

11. As a condition of receiving federal funds from USDOT and FHWA, MDT must implement a Disadvantage Business Enterprise Program.

> 49 C.F.R. 26.21

12. As a result of the Western States Paving decision by the Ninth Circuit, the

USDOT issued "Questions and Answers" that required disparity studies be conducted before resuming race conscious goals.

> Doc. 45-2 p.14: Ex. 2: USDOT Guidance: Western States Paving Co. Case Q&A

13. In 2006 MDT ceased using race and gender conscious goals.

> Doc. 45-4 p.13
> Ex 17: LaNoue Report p.13

14. In 2007 MDT commissioned a disparity study by the D. Wilson Consulting Group LLC ("Wilson") that was completed in 2010.

> Doc 13: Amended Complaint p.4 ¶ 4.6
> Doc 15: Answer p.4 ¶ 4.6
> Doc. 45-2 p.18: Ex 3: Wilson Disparity Study (excerpts)
> (The full study and appendices are found at www.mdt.gov/business/contracting/civil/dbe.shtml)

15. The Wilson Study found that DBE's minority and female subcontractors were significantly overutilized in Montana highway subcontracting.

> Doc. 45-2: Ex. 3: Wilson Study p. ES-1
> Table ES-2

16. The Wilson Study recommended the MDT use only race neutral goals for at least a period of two years.

> Doc. 45-2 p.27: Ex. 3: Wilson p.ES7

17. The Wilson Study is flawed because

    a. It is overinclusive and not confined to firms that are qualified, ready, willing and able to perform work on MDT contracts.

Ex 17: LaNoue pp.20-29

b.  Does not calculate disparity ratios correctly because it combines the availability of DBEs in professional services and those performing subcontracting counting the availability as equal, with no weighting when DBEs when DBEs in professional services comprise only a very small portion of the available work.

Ex 17: LaNoue 31-33

c.  The disparity ratios are not calculated correctly because they compare the subcontracts and dollars received by subcontractors to the overall (whole) contract dollars (both sub and prime).

Ex 17: LaNoue pp. 33-34

d.  The Study did not use a regression analysis to determine the effects of factors other than discrimination that may account for statistical disparities between DBE participation availability and participation in MDT highway contracts.

Ex 17: LaNoue pp14-20

e.  The Wilson study used a regression analysis of private contracting.

Ex 17: LaNoue pp.20-

f.  Anecdotal samples were not statistically sufficient because of the few responses received.

Ex 17: LaNoue pp. 9, 18, 19, 58

g.  Anecdotal samples were neither random nor stratified but resulted from self-selection.
Ex 17: Lanoue pp.9, 18, 19, 58

h.  The level of response to interviews was low.  Of the 3789 firms identified, telephone interviews were attempted with only 700 (18%).

Ex 17: LaNoue p.28

i. The response to the interviews was low: approximately 180 firms responded.

Ex 17: LaNoue p.20

j. Five "public hearings" were scheduled:
No one attended the hearing in Missoula;
Two attended the meeting in Helena (no testimony);
Three attended the hearing in Billings (1 testified);
The Glendale hearing was cancelled; and
One attended the Bozeman hearing (1 testified)

Ex 3: Wilson Study p.7-4

k. Personal interviews were conducted with 59 businesses:
Six were Native American
Twenty one were women owned
Twenty one Caucasian owned

Ex 3: Wilson study p. 7-6

18. MDT submitted Uniform Reports required by the USDOT which showed the performance of the MDT DBE program (2007-2013).

Ex 4: Uniform Reports

19. The Uniform Reports submitted by MDT for the years 2007-2013 showed an overutilization of minority and female subcontracts in MDT construction contracts.

| FY - Year | Overutilization | |
| --- | --- | --- |
| | By Number of Subcontracts | By Dollar |
| 2008* | 952% | 548% |
| 2009* | 1260% | 589% |
| 2010* | 953% | 397% |

| 2011 | 1116% | 575% |
|------|-------|------|
| 2012 | 1383% | 795% |
| 2013 | 1726% | 1239% |

* Race Neutral Years

Ex 4: Uniform Reports
Ex. 17: LaNoue Report pp. 34-38

20. The Uniform Reports submitted by MDT contained substantial and

significant errors by omitting subcontracts awarded to DBEs.

Ex 5: Contracts omitted from Uniform Reports
Stmt. T. Larson ¶ 5-7

The Wilson Study did not use or consider the MDT Uniform Reports.

Ex 15: Dep. D. Kyle 74:1-20

21. In FY 2010 the MDT initially submitted a goal methodology to

USDOT/FHWA that included the imposition of a race conscious goal of

2.05%.

Ex. 6(a): MDT FY 2010 Goal Methodology
(proposed)

22. The FY 2010 goal methodology (proposed) was rejected by the FHWA and

only race and gender neutral goals were utilized.

Ex 8: Dep. Cozzie 21-23

23. The imposition of race conscious goals in the FY 2011-2013 Goal

Methodology was based solely upon a decrease in utilization of DBEs.

Ex 8: Dep. Cozzie 27:10-23
29:19-21

24. At the time MDT imposed race and gender conscious goals in FY 2011-2013 it had no evidence to demonstrate that the cause of the decrease of DBE utilization was discrimination against minority or female owned business.

Ex 8: Dep. Cozzie 29:22-30:1

25. The MDT and its civil rights division have not received a complaint that a minority or female has been discriminated against in the award of prime or subcontract.

Ex 19(a): Interrogatory 6
Ex 19(c): Supp. Response to Interrogatory 6

26. The few complaints received by MDT and its civil rights division have involved individuals who complained that they had personally experienced some employment discrimination.

Ex 19(a): Interrogatory 6
Ex 19(c): Supp. Response to 6

27. After having conducted the disparity study Ms. D. Kyle Project Coordinator of the D. Wilson Disparity Study:

a. Was unable to state there was a deliberate pattern of exclusion which affects women and minorities in Montana highway construction industry.

Ex 15: Kyle Dep. 73:21-25

b. There was no identifiable prime contract in which discrimination occurred.

Ex 15: Kyle Dep. 79:10-13

c. There was no identifiable subcontract in which discrimination occurred.

d.  There was no identifiable private market construction contract in which discrimination occurred.

Ex 15: Kyle Dep. 79:17-20

e.  There were no anecdotes in the disparity study provided convincing evidence of discrimination.

Ex 15: Kyle Dep. 73:1-5

28. The Wilson study made no determination of whether there were any disparities on state funded highway contracts (p.5-4) and there are no findings by any other authority of discrimination on state funded contracts, but MDT sets DBE goals on state dollars in projects funded with a mix of state and federal dollars.  There is no federal regulatory mandate for that practice.

29. Ms. Cozzie participated in the development of the FY 2011-2013 DBE goal methodology.

Ex. 32: Dep. Cozzie 33:3-7

30. Ms. Wendy Stewart was the DBE program manager at MDT.

Ex. 33: Dep. Stewart 8:10-16

31. Ms. Stewart was responsible for maintaining the "DBE Suite" at the MDT.

Ex. 33: Dep. Stewart 8:22

32. The DBE Suite contained a list of DBE's registered in Montana.

33. Part of Ms. Stewart's duties at MDT was to create the DBE goal

methodology, including the FY 2011-2013 goal.

Ex. 33: Dep. Stewart 45:12
49:22-24

34. MDT did not use the Wilson Disparity Study as the basis for adopting race

conscious goals in 2011 and 2012.

Doc. 45-4 p.177
Ex. 19(f) RTA 8

35. Ms. Stewart used the DBE Suite to determine availability of DBEs for the

FY 2011-2013 goal methodology.

36. Ms. Stewart (and MDT) considered all DBE's as "ready, willing, and able."

Ex. 33: Dep. Stewart 47:22-23

37. The list of DBEs considered to be available were those with NAICS codes

related to highway construction.

Ex. 33: Dep. Stewart 47:22-25

38. The DBEs MDT considered available was only a "headcount".

Ex. 33: Dep. Stewart 48:7-9

39. The headcount used in determining the FY 2011-2013 DBE methodology

DBEs "available" was not adjusted for size, capacity, or any other factor.

Ex. 33: Dep. Stewart 48:15-20
50:3-11

51:21-25
52:1-2

40. Ms. Stewart did not use the number of ready, willing and able DBEs

developed by the Wilson study. She did not know what the disparity study

used.

Ex. 33: Stewart 51:11-16

41. The determination of ready, willing and able DBEs in the FY 2011-2013

DBE goal methodology came from the "DBE Suite".

Ex. 33: Stewart 51:17-20

42. The reason race conscious goals were implemented in the FY 2011-2013

DBE goal methodology was that DBE utilization was falling (decreasing).

Ex. 33: Dep. Stewart 52:4-7
Doc. 45-2 p.129
Ex. 8 Dep. Cozzie 27:10-23
                       29:19-21

43. At the time MDT imposed race and gender conscious goals in FY 2011-

2013 it had no evidence to demonstrate that the cause of the decrease of

DBE utilization was discrimination against minority or female owned

business.

Doc 45-2 p.129
Ex 8: Dep. Cozzie 29:22-30:1
Ex. 33: Dep. Stewart 52:14-18

44. In FY 2011-2013 MDT imposed a race and gender conscious goal of

3.27%.

Doc. 45-2 p.92
Ex 6(c): FY 2011-2013 MDT Goal Methodology

45. In setting the FY 2011-2013 race conscious goals MDT used the rationale

that the utilization of DBE's in MDT contracts should be the same (or close

to) the availability of DBEs (i.e. proportionality).

Doc. 45-2 p.129
Ex 8: Dep. Cozzie 30:8-31:16

46. In determining the FY 2011-2013 utilization of DBEs, MDT did not use any

method let alone recognized and accepted statistical methods to control for

factors other than discrimination that might have caused the decrease in use

by the use of multivariate regression analysis or any other valid social

science method.

Doc. 45-2 p.90-100
Ex 6(c): FY 2011-2013 Goal Methodology
Ex. 33: Dep. Stewart 48:10-20

47. There have been no legislative findings of past discrimination in the

Montana highway construction industry.

Doc 45-4 pp.151, 152
Ex 19(a): Interrogatory 1 & 2

48. There are no administrative findings that there has been race, gender, or

national origin discrimination in the Montana highway construction industry.

Doc. 45-4 pp.152
Ex 19(a): Interrogatory 4
Doc. 45-4 p.160

Ex 19(b): Supp. Answer to Int. 4

49. There have been no judicial findings that race, gender or national origin discrimination has occurred in the Montana highway construction industry.

> Doc. 45-4 p.152
> Ex 19(a): Interrogatory 3
> Doc. 45-4 p.160
> Ex 19(b): Supp. Response to Int. 3

50. MDT and its employees have never discriminated against women or minorities in the award or performance of MDT administered contracts.

> Doc. 45-4 p.153
> Ex 19(a): Interrogatory 5

51. The MDT and its civil rights division have not received a complaint that a minority or female has been discriminated against in the award of prime or subcontract.

> Doc. 45-4 p.153:
> Ex 19(a): Interrogatory 6
> Doc. 45-4 p. 103:
> Ex 19(c): Supp. Response to Interrogatory 6

52. The few complaints received by MDT and its civil rights division have involved individuals who complained that they had personally experienced some employment discrimination.

> Doc. 45-4 p.153:
> Ex 19(a): Interrogatory 6
> Doc. 45-4 p.163:
> Ex 19(c): Supp. Response to 6

53. After having conducted the disparity study Ms. D. Kyle, Project

Coordinator of the D. Wilson Disparity Study:

    a. Was unable to state there was a deliberate pattern of exclusion which affects women and minorities in Montana highway construction industry.

                        Doc. 45.3 p.60
                        Ex 15: Kyle Dep. 73:21-25

    b. There was no identifiable prime contract in which discrimination occurred.
                        Doc. 78-2 p.2
                        Ex 31: Kyle Dep. 79:10-13

    c. There was no identifiable subcontract in which discrimination occurred.
                        Doc. 78-2 p.2
                        Ex 31: Kyle Dep. 79:14-16

    d. There was no identifiable private market construction contract in which discrimination occurred.

                        Doc. 78-2 p.2:
                        Ex 31: Kyle Dep. 79:17-20

    e. There were no anecdotes in the disparity study provided convincing evidence of discrimination.

                        Doc. 45-3 p.60
                        Ex 15: Kyle Dep. 73:1-5

54. The Wilson study made no determination of whether there were any disparities on state funded highway contracts (p.5-4) and there are no findings by any other authority of discrimination on state funded contracts, but MDT sets DBE goals on state dollars in projects funded with a mix of state and federal dollars. There is no federal regulatory mandate for that

practice.

Doc. 45-2 p.18ff

55. MDT awards prime contracts to the low competitive bidder who has met the
contract specifications.

> Doc. 78-1 p.2 Doc. 45-2 p.167:
> Ex 30: Dep. Warren 80:21-81:9
> Doc. 45-3 p. 21:
> Ex 14: Dep. Rehbein 40:7-11
> Doc. 45-3 p.6:
> Ex 12: Dep. Blossom 34:21-24

56. MDTs award of prime contracts is race neutral.

57. The process by which a prime contractor assembles a competitive bid for a
prime contract is fluid, with quotes for subcontracts often not being
submitted until the day before the competitive bid is due to be submitted.

> Doc. 45-2 p.158
> Ex 11: Dep. Warren 26:4-27:6

58. Those seeking the prime contracts generally use the low quote from
subcontractors.

> Doc. 45-2 p.158
> Ex 11: Dep. Warren 27:16-28:4; 28:17; 29:6
> Doc. 45-3 p.21-22
> Ex 14: Dep. Rehbein 40:23-41:9
> Doc. 45-3 p.13-14
> Ex 13: Dep. Schmit 36:21-37:13
> Doc. 45-3 p.6
> Ex 12: Dep. Blossom 34:8-24

59. When the race and gender conscious goals were imposed by MDT in FY

2011-2013 the MDT began imposing "contract goals" on selected MDT

contracts.

> Doc. 45-2 p.143
> Ex 10: McCubbins p.24

60. The race and gender conscious contract goals imposed by MDT from June

2012-June 2014 required that prime contractors award a specified percentage

of the total contract dollars to DBEs.

> Doc. 45-2 p.160:
> Ex Dep. Warren p.36

61. A prime contractor was expected to meet the "contract goals" to be awarded

the contract.

> Doc. 45-2 p.160:
> Ex 11: Dep. Warren p.36:12-18

62. During FY June 2012-June 2014 when the race conscious contract goals

were imposed, MDT had a program by which prime contractors who did not

achieve contract goals but were the low bidder could be awarded the

contract by demonstrating "good faith efforts".

> Doc. 45-2 p.6:
> Ex 1: MDT DBE Program pp. §2.4 p.11
> Doc. 45-2 p.119:
> Ex 7: MDT Good Faith Efforts criteria

63. During FY 2011-June 2014 when race and gender conscious goals had been

imposed by MDT only one (1) contract was awarded (to Riverside) based

upon good faith efforts when it had not met the contract goal.

> Doc. 45-4 p. 153-154:
> Ex 19(a): Interrogatory 7
> Doc. 45-3 p.22:
> Ex 14: Dep. Rehbein p. 41:10-20

64. The reason that contract was awarded without meeting the DBE goal was that the responsible person in the civil rights division was on vacation.

> Doc. 45-3 p.19:
> Ex 14: Dep. Rehbein 28:10-20

65. Schellinger Construction was the low bidder on two MDT prime contracts, did not meet the race conscious goal and sought to be awarded the contract based on good faith efforts.

> Doc. 45-2 p.154ff:
> Ex 11: Dep. Warren

66. In the first attempt, Schellinger was the low bidder by $400,000 and it had

   a. Contacted four (4) DBEs to work on the contact;

   b. One declined the work because the distance to the site of work made it uneconomical;

   c. Three provided quotes that were considerably higher than MWHC;

   d. Schellinger decided to use MWHC because the bid was substantially lower;

   e. Schellinger achieved part of the contract goal.

> Doc. 45-2 p.160-162:
> Ex 11: Dep. Warren 36:19-44:5

67. MDT rejected Schellinger's low bid because it did not meet the required

DBE use.

Doc. 45-2 p.162:
Ex 11: Dep. Warren 41:24-42:1

68. Schellinger protested the loss of the contract which was denied by MDT.

The protest was denied.

Doc. 45-2 p.162:
Ex 11: Dep. Warren 42:1-43:22

69. After loss of the contract, Schellinger sought guidance from MDT as to

what would constitute good faith efforts. MDT explained to Schellinger that

GFE required a two week history of documenting efforts to contact DBEs,

Schellinger needed to contact more DBEs, Schellinger didn't solicit DBEs

from out of state that are in the DBE registry, and calls to DBEs had to be

made prior to 48 hours of the bid.

Doc. 45-2 p.162:
Ex 11: Dep. Warren 42:14-44:3

70. Following the MDT guidance Schellinger sought the Whitefish project

based upon GFE by calling DBEs two to three weeks before the bid, using

the entire MDT DBE call list (including those from out of state), and

documenting the calls. Schellinger did not meet the DBE goal because there

was a substantial difference (30-100%) between DBE subs and non DBE

subs quotes which was believed by Schellinger to be excessive.

Doc. 45-2 p.163:
Ex 11: Dep. Warren 45:17-47:22

71. MDT rejected Schellinger's GFE despite Schellinger being the low bidder.

> Doc. 45-2 p.163:
> Ex 11: Dep. Warren 48:1-4

72. Following the two (2) attempts to achieve GFE's Schellinger decided that it could not achieve award of a prime contract without meeting the required race conscious goals.

> Doc. 45-2 p.164
> Ex 11: Dep. Warren 49:22-50:17

73. The determination reached by Schellinger in #57 resulted in Schellinger being required to use DBE's to meet the required race and gender conscious goals despite the DBE's submitting higher quotes than the non-DBE's for the same work.

> Doc. 45-2 p.164
> Ex 11: Dep. Warren pp. 50:13-17

74. Other prime contractors in the Montana highway construction industry have reached the conclusion that a prime contract cannot be awarded unless it meets the required DBE race conscious goals.

> Doc. 45-2 p.161
> Ex 11: Dep. Warren 37:1-5

75. MWHC provided the low quotes for the contracts identified in ¶76. Although MWHC provided the low quotes for all projects identified in ¶76, the prime contractors either did not receive the subcontract due to the improper implementation of the DBE program or did not utilize MWHC's

low quote due to the improper implementation of the DBE program.  As a result MWHC suffered monetary damages for all lost work identified in ¶76.

76.

| | Date of Letting | Project Name | Awarded | Project Number | DBE Contract Goal |
|---|---|---|---|---|---|
| A. | 6/21/12 | Libby-West | Knife River Awarded Contract | CBI 1-1(91)20 | 6.0% |
| B. | 9/20/12 | SF 079 Canyon Ferry Rd | Helena Sand & Gravel Awarded Contract | HSIP 284-2(13)6 | 10% |
| C. | 10/11/12 | Amsterdam Road/I-90 EB on Ramp | Knife River Awarded Contract | IM 90-6(126)298 | 8.5% |
| D. | 11/8/12 | Bonner Interchange-East (I-90) | Riverside Awarded Contract | IM 90-2(126)110 | 6.0% |
| E. | 11/8/12 | Norris-East | Schellinger Awarded Contract | STPP 84-1(14)0 | 8.0% |
| F. | 5/8/13 | Nissler Interchange | Schellinger Awarded Contract | IM-NHTSA 15-2(80) etc. | 3.0% |
| G. | 5/23/13 | West of Richey-West | Scarsella Awarded Contract | STPS 254-1(21)44 | 3.0% |
| H. | 7/25/13 | Arrow Cr South & Arrow Cr Slide | M.A. Deatley Awarded Contract | STPP 80-1(27)43 & etc. | 2.0% |
| I. | 8/15/13 | Florence-East | Schellinger Awarded Contrct | STPS-STPB 203-1(12)10 | 4.5% |
| J. | 9/26/13 | MT 16-Culbertson | Riverside Awarded Contract | CBIL-NH-STPE 62-1(11) | 3.0% |
| K. | 4/24/14 | Kalispell-West | LHC, Inc. Awarded Contract | HSIP-NHPB 1-2(135)114 | 2.5% |
| L. | 5/22/14 | Thompson River-East | Sletten Awarded Contract | STPB-STPP-HSIP 6-1(10) | 2.0% |

77. Prior to 2006 when MDT imposed contract goals all MDT contract goals

were "set in stone" and had to be met or the contract would not be awarded.

> Doc. 45-2 p.165:
> Ex 11: Dep. Warren 54:2-12

78. MDT abandoned the use of race and gender conscious goals in FY 2014 after the filing of this litigation.

> Doc. 45-2:
> Ex 6(e): FY 2014-2016 Goal Methodology

79. MDT has developed a DBE program guide.

> Doc. 45-2 p.1ff:
> Ex 1

80. The DBE Program Guide defines "overconcentration."

> Doc. 45-2 pp.9:
> Ex 1: pp.19

81. DBEs are overconcentrated in subcontracting for traffic control, installation of signs, guardrails and concrete barriers and MDT highway construction projects.

> Doc. 45-2 p.147:
> Ex 10: Dep. McCubbins 44:11-15

82. MDT has not sought waivers from the USDOT/FHWA.

> Doc. 45-4 p.179:
> Ex 19(f): Request to Admit 14

83. The Wilson study recommended the creation of a "race neutral small business enterprise (SBE) program to encourage contracting with all small businesses, including DBE businesses."

84. The Wilson study recommended as a part of the SBE program:

    a. Race neutral criteria be created for small businesses to be certified as a SBE;

    b. Supportive services be incorporated within the SBE program which would include bonding reimbursement and tuition reimbursement;

    c. Small contracts be reserved for SBE firms.

Doc. 45-2 pp.39-40

85. MDT did not establish a SBE program.

Doc. 45-2 pp.68-76
Doc. 45-2 pp.78-88
Doc. 45-2 pp.90-100

86. As a result of the improper implementation of a DBE program MWHC suffered measurable damages. MWHC provided credible and reliable damage testimony that demonstrated that MWHC suffered damages in the amount of $403,380.20 due to MDT's improper implementation and administration of its DBE program.

87. The Court finds MWHC suffered damages in the amount of $403,380.20. MWHC is entitled to attorneys' fees as a result of this litigation and the damages it suffered due to MDT's improper implementation and administration of its DBE program.

88. The Court does not find the proffered expert testimony from the MDT's damage experts persuasive.

From the foregoing findings of fact, the Court makes the following conclusions of law:

## CONCLUSIONS OF LAW

1. Because racial preferences are a factor in the State's program, Title VI of the Civil Rights Act, 29 U.S.C. § 2000d is implicated. That Act provides:

   No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, or denied benefits of, or subjected to discrimination under any activity receiving federal financial assistance.

   29 U.S.C. § 2000d

2. The lawsuit also implicates the Equal Protection Clause of the United States Constitution because of a violation of the Equal Protection Clause is also a violation of Title VI. *Gratz v. Bollinger*, 539 U.S. 244, 275 (2003); *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001).

3. The Supreme Court has long and consistently held that "distinctions between citizens solely because of their ancestry are by their very nature odious to a free people." *Regents of Union Calif. v. Bakke*, 439 U.S. 265, 289 (1978); *Adarand v. Pena*, 515 U.S. 200, 214 (1995); *Hirabayashi v. U.S.*, 320 U.S. 81, 100 (1943); *Yick Wo. V. Hopkins*, 118 U.S. 356, 374 (1986). Such classifications are "inherently suspect" and "presumptively invalid". *Fisher*

*v. Univ. of Texas*, 570 U.S. 297, 133 St. Ct. 2411, 2419 (2013); *Shaw v. Reno*, 509 U.S. 630, 644 (1993).

4. The ultimate burden of justifying the use of racial classifications "…is demanding and rests **entirely** on the state". *U.S. v. Virginia*, 518 U.S. 515, 533 (1996); *Western States Paving v. WSDOT*, 407 F.3d 983, 990 (9th Cir. 2005) [emphasis added].

5. "Strict scrutiny," a "detailed, skeptical, non-differential analysis is required" by the court. *Rothe v. Dept. of Defense*, 545 F.3d 1023, 1047 (Fed. Cir. 2008). Racial classifications can be upheld **only** in the most "extreme case" in there is a "strong basis in evidence" which shows a deliberate pattern of exclusions", *Croson*, 448 U.S. at 509.

6. The court must presume the Montana DBE program is invalid. *Adarand*, 515 U.S. at 223-24; *Grutter*, 539 U.S. at 326. The burden of justifying the DBE program is "exacting" and rests **entirely** with the state. *Western States*, 407 F.3d at 990, *Adarand*, 515 U.S. at 224.

7. To establish a claim under Title VI a plaintiff must allege and prove (1) the MDT received federal assistance and (2) engaged in discrimination on a prohibited ground. *Fobbs v. Holy Cross Health Sys.*, 29 F.3d 1439, 1447 (9th Cir. 1994), overruled on other grounds *Davita v. Columbia/HCA*, 241 F.3d 1131 (9th Cir. 2001).

8. The degree of proof necessary to establish a prima facie case is minimal and does not even need to rise to the level of a preponderance of the evidence. *Rashdan v. Geissberger*, 764 F.3d 1179, 1183 (9th Cir. 2014). Here it is undisputed that MDT received federal funds and established classifications that gave a preference based upon race. The prima facie case has been established.

9. The burden of justification of the use of racial classifications upon the State. Once MDT establishes a prima facie case, that MDT established and utilized racial classifications. The burden shifts to MDT to "justify" the use of racial classifications. That burden is "demanding" and rests **entirely** on the state. *U.S. v. Virginia*, 518 U.S. at 531; *Western States*, 407 F.3d at 990 [emphasis added]. Thus the burden of proof and persuasion is **entirely** on the state to justify the use of race based preferences.

10. Title VI bars intentional discrimination. See *Guardians Ass'n v. Civil Service Commission*, 463 U.S. 582, 607-08 (1983); *Alexander v. Choate*, 469 U.S. 287, 292-93 (1985). Intentional discrimination occurs when the recipient acted, at least in part, because of the actual or perceived race, color, or national origin of those who were subject to the discriminatory treatment. *Doe v. Lower Marion School Dist.*, 665 F.3d 524, 548 (3rd Cir. 2011).

11. The Supreme Court in *Croson, 488 U.S. at 493* and *Adarand Contractors*, 515 U.S. at 226 established that any intentional use of race, whether for malicious or benign motives is subject to most careful and strict judicial scrutiny. Accordingly, the record need not contain evidence of "bad faith, ill will or any evil motive on the part of the [recipient]". *Williams v. City of Dothan*, 745 F.2d 1406, 1414 (11th Cir. 1984).

12. A recipient's express or admitted use of classifications based upon race, color, or national origin establishes intent without regard to the decision maker's animus or ultimate objective. **Such classifications demonstrate a discriminatory purpose as a matter of law**. *Miller v. Johnson*, 515 U.S. 900, 904-05 (1995); *Wittmer v. Peters,* 904 F. Supp 845, 849-50 (C.D. Ill. 1995) Aff'd 87 F.3d 916 (7th Cir. 1996) "put another way, direct evidence of intent is 'supplied by the policy itself'" *Hassen v. City of New York*, 804 F.3d 277, 295 (3rd Cir. 2015) (quoting *Massarsky v. GM*, 706 F.2d 111, 128 (3rd Cir. 1983)).

13. The focus is on how the recipient's actions specifically deprived or otherwise adversely affected the individual or individuals of access to a federally funded program or benefit. Even benign motivations for racial classifications are "presumptively invalid". *Adarand*, 515 U.S. at 223-24; *Grutter*, 539 U.S. at 326.

The principle that ethnic discrimination is wrong is what makes discrimination against groups of which we are not members wrong, and by the principle, discrimination is wrong even if the beneficiaries are members of groups whose fortunes we would like to advance. The person required by government to engage in discrimination suffers injury in fact, albeit of a different kind, as does the person suffering the discrimination. A "law compelling persons to discriminate against other person because of race" is a "palpable violation of the Fourteenth Amendment," regardless of whether the persons required to discriminate would have acted the same way regardless of the law. *Peterson v. City of Greenville,* 373 U.S. 244, 248, 83 S.Ct. 1119, 1121, 10 L.Ed.2d 323 (1963); *Monterey Mechanical v. Wilson*, 125 F.3d 702, 707-08 (9th Cir. 1997).

14. To justify the use of race based preferences the state must prove (1) the existence of discrimination in its highway contracting program (or its lingering effects) and (2) that the DBE program is narrowly tailored. *Western States*, supra.

15. The MDT has no direct evidence of discrimination. Through discovery the state has conceded that (1) there are no judicial, administrative, or legislative findings of discrimination; (2) the state has never discriminated in the award of a contract; (3) the state is not aware of any general contractor who discriminated in the award of a subcontract.

16. Lacking direct evidence of discrimination the state commissioned a disparity study by the D. Wilson Consulting Group. The purpose of such study is to determine whether there is a disparity between the availability and utilization of minorities. *Croson* held that if there is a "significant

disparity" between ready, willing, and able DBE contractors and utilization

an inference of discrimination "could" arise. 488 U.S. at 509.

17. The Wilson study recommended:

> The Montana Department of Transportation (MDT) should continue operating in a race-neutral environment and implement a small business program. In the area of construction, the availability of DBEs is so low that MDT should focus on assisting DBE businesses to increase capacity; and, identify new DBE businesses to participate in its program. The construction program should be monitored carefully to ensure that the DBE firms continue to participate at their levels of availability. If the utilization rates decrease below availability, the MDT should consider implementing race-conscious measure for the DBE groups affected.

18. There are significant difficulties with that study and questions whether it is

admissible.

19. Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

20. This Rule assigns to the court "the task of ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at

hand." *Daubert,* 509 U.S. at 597.

21. Under *Daubert*, a trial court faced with a proffer of expert testimony

Must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592-93. These factors are not exclusive and should be applied as relevant to the particular case at hand. *Kumho*, 526 U.S. at 152-53. *See also Daubert*, 509 U.S. at 591 (the theory must "fit" the facts of the case, *i.e.*, be relevant).

22. This "gatekeeping" function applies to all expert testimony proffered under Rule 702. *Kumho Tire Co*, 516 U.S. at 149 (1999) (extending *Daubert's* holding on scientific expert testimony to all expert testimony). See also *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("…applies not only to scientific testimony but to all expert testimony"). It is the district court's duty to "act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

23. *Daubert's* gatekeeping function has been distilled into two inquiries: (1) whether the expert's proffered testimony has a "reliable basis in the knowledge and experience" of the expert's discipline and (2) whether the proposed testimony or evidence "is sufficiently 'relevant to the task at

hand.'" *Id*. at *Ellis,* 657 F.3d at 1120-21 (quoting *Daubert*, 409 U.S. at 592, 597).

24. The objective "is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152.

25. The reliability threshold requires that the expert's testimony have "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co., Ltd.,* 526 U.S. at 149.  The court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93. To aid courts in exercising this gatekeeping role, the Supreme Court has suggested a non-exclusive and flexible list of factors that a court may consider when determining the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592-94. Thus the Federal Rule of Evidence 702 as explicated by the *Daubert* line of cases requires that to be

admissible, expert testimony must be based upon sufficient facts and data and apply the principles and methods reliably to those facts. Without such safeguards the analysis is merely the "ipse dixit of the expert." *Kumho Tire Co.,* 526 U.S. at 141. "The test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Cabrera*, 134 F.3d at 1421 quoting *Daubert v. Merrel Down Pharma.* ("*Daubert II*") 43 F.3d 1311, 1318 (9th Cir. 1995).

26. The Montana Department of Transportation engaged the D. Wilson Consulting Group LLC to conduct an "availability and disparity study." The study was completed in August 2009 and revised in January 2010. The study covered the period of October 1, 1999 through September 30, 2006 (FY 2000 – FY 2006). The stated purpose or "primary objectives" of the study were to "identify and characterize":

- The extent to which Disadvantaged Businesses participate in the procurement of federally funded highway, airports and transit contracts within Montana.

- Whether DBE participation is representative of the availability of minority and women owned businesses ready, willing and able to participate in the federally funded State contracts within Montana.

- Whether discrimination exists and if found, its identification by DOT modal group as well as individually, by race, ethnicity and gender of all groups affected.

- Presumed disadvantaged groups that are over or underutilized on federally assisted State contracts based upon their availability.

- The magnitude of differences between DBE availability (based on capacity) and DBE participation on federally assisted State contracts.

27. The study identified in its "methodology" that it had

> reviewed and analyzed the impact of relevant court decisions…including…*Western States Paving v. Washington Department of Transportation.* It also "reviewed federal and state statutes, regulations, policies and procedures that impacted the DBE program…

28. Ms. Deirdre Kyle was the sole member of the D. Wilson Consulting Group LLC. Ms. Kyle had a Bachelor of Science degree in Political Science and an Associate's Degree in General Education. She conducted no research to obtain either degree.

29. Although the D. Wilson consulting group had some 5-6 employees at the time the MDT study was conducted, she also used consultants. Mr. Jeff Ling of Evergreen Consulting was responsible for the availability analysis. However, Ling did not determine availability it was Mr. Ling's staff who wrote the availability analysis. (Ling 44:14-15).

30. The D. Wilson Study lacks reliability and is inadmissible.

31. The D. Wilson Study failed to utilize the required and acceptable methodology to determine availability of ready, willing and able DBEs.

32. In *Western States Paving* the court was clear that in determining availability the state is required to account and control for factors other than race that may affect the capacity of DBEs to undertake contracting work. 407 F.3d at 999. The court noted there are many reasons DBE firms may not be available: "DBE firms may be smaller and less experienced"…"may be contracted in certain geographical areas rendering them unavailable for a disproportionate amount of work"…"it does not account for the relative size of the firms, either in terms of ability to do particular work or in terms of the number of tasks they have resources to complete"…"minority firms may not have bid on construction contracts because they were generally small companies incapable of taking on large projects, or they may have been fully occupied on other projects, or the…contracts may not have been as lucrative." 407 F.3d at 1001.

33. The *Western States* court found the state's statistical evidence lacking because "the states statistical evidence controls for none of these factors." 407 F.3d at 1001.

34. The USDOT issued guidance to the states following the *Western States*

decision in which it emphasized that a disparity study:

> …should rigorously determine the effects of factors other than discrimination that may account for statistical disparities between DBE availability and participation. This is likely to require a multi-variate regression analysis.
>
> Doc. 45-2 p.15

35. The Wilson Study did not include the required methodology.

36. A review of the D. Wilson study shows that no multi-variate regression analysis appears in the study.[1] MDT admitted that a multi-variate regression analysis was not used. (Ex. 101 RTA 17).

37. The author of the D. Wilson study was Ms. Deirdre Kyle. Ms. Kyle assigned and relied upon Mr. Ling to determine availability. (Kyle 23:3-5). She strangely asserted that she checked Ling's work for accuracy (Kyle 23:10-11) but did nothing to determine if the methodology used was correct. (Kyle 23:13-14)[2]. Simply, Ms. Kyle had no reasonable knowledge or information whether the availability figures had been adjusted for factors other than race.

38. The MDT questioned the accuracy and reliability of the Wilson study. (MWHC Ex. 114).

39. Ms. Sheila Cozzie was the MDT Civil Rights Bureau Chief and responsible

---

[1] The words "regression analysis" appears in a parenthetical expression at page 4-3 and references Appendix C. – however there is no Appendix C in the document.

[2] All Ms. Kyle could relate about the calculation of availability was "I can tell you how the data was collected. You will have to talk to Dr. Ling about how it was calculated." (Kyle 41:16-18).

for the DBE program. (Cozzie 7:2-12). Ms. Cozzie questioned the Wilson study's determination that there were 6,928 firms ready, willing and able to do work in Montana and believed the number was high. (Cozzie 23:16; 24:5; 18-19). She spoke with others, including the Director of MDT and all agreed that the number was high. (Cozzie 25:4-19).

40. The correspondence between MDT and D. Kyle of the Wilson group confirms the concerns of MDT that the information provided by Wilson was not accurate. Among other concerns were the emails asking "what assurances do we have that these numbers are correct? Why have the numbers changed so significantly?" (Ex. 114). Further explaining the concerns MDT pointed out "I'm still concerned as to how we went from 1,337 construction firms in the draft to 5,813 construction firms today with other numbers in between," "Now we have yet another number for availability. I have never seen the 4,913 number before the email. So frustrating…" (Ex. 114). "How can we be sure the numbers you provide are correct?" (Ex. 114).

41. The ever changing numbers and expressed doubts and concerns of MDT lend to the conclusion that the Wilson study lacks the reliability required.

42. The theory and technique utilized by the D. Wilson Study does not enjoy general acceptance within the relevant scientific community.

43. The acceptable methodology must include a determination of availability that takes into account factors other than race. It is undisputed the Wilson study did not account for those factors and as a result cannot be accepted within the "relevant scientific community".

44. However, there are more deficiencies in the Wilson study that demonstrate the failure to follow recognized techniques and methodology. These deficiencies are identified in the report of Dr. LaNoue (Ex. 56) and his testimony:

- The study starts with the "universe of all contractors that could perform the work of 3,789 firms, which was, without explanation, increased to 6,591 firms. Ex 3; Compare Table 4-1 p.4-5 to Table 4-3 p.4-6 and 4-5 p.4-8; Ex 16: Dep. Ling pp. 58. (No explanation has ever been offered).

- The study lists 2 Black American subcontractors and 5 Black Americans in professional services. Somehow the sum of those numbers became 13. (Table 4-5). Ex 3 Table 4-5. (Failure to follow basic principles of math).

- Anecdotal samples were few in number and were neither random nor stratified. PSMF 15(g).

- The responses to the telephone surveys were so low as to render the sampling meaningless. PSMF 15(f)-(i).

- Anecdotal samples were self-selected and not verified for accuracy. PSMF 15(k).

- Those responsible for the Disparity Study had no idea of how capacity was determined or how availability was weighted. Ex 16: Dep. Ling 65-66; Ex 15: Dep. Kyle 41.

- Dr. Ling did not write the availability chapter as Ms. Kyle claimed. Nor could he answer many of the questions about the availability calculations, she said he would have responsibility for. Good social science requires researchers to understand their data sources and the methods used to statistically analyze it. Without that information, it is not possible for anyone else to replicate a study's conclusions or determine its accuracy. p.20.

- These lists yielded a "master data base" of 3,789 firms. (Table 4-1, p.4-5). There is no information in the study about what proportion of firms in the master data base came from which source and Ling didn't know (Ling p.50-51). This is information which good social science would require. p.17.

- The Wilson study properly recognized that this data base was only a head count (p.4-3), so it moved to create a "subset of qualified willing and able firms from the overall pool of firms." (p.4-3). This is a key step, but Wilson's methodology for creating this subset is only partially discernible from the text of the report and Mr. Ling could not explain it. Some flaws in the study's methodology, however, are obvious. p.27.

- The Wilson study asserts that the key assumptions in the filtering processes were that the "business survey respondents were representative of the firms in the overall data base therefore patterns of revenue generation and business patterns were similar to those of firms in the master data vendor data base." (p.4-4). Whether those assumptions were correct depends on whether the study had a non-response or response bias problem or whether, in fact, the responses were representative of the larger data base. A non-response bias occurs when substantial number of those surveyed refuses to participate. A response bias problem occurs when those who do participate are not representative of the larger sample. It appears that the Wilson study encountered both problems. P.28.

- After analyzing the results of its telephone survey, Wilson altered the raw numbers it found in Montana from 3,789 firms (Table 1, p.4-5) to an "adjusted" availability number of 6,591 firms (Tables 4-3, p.4-6 and Table 4-5, p.4-8). How Wilson made this adjustment is not clear form the study documents and could not be explained by Kyle or Ling in their depositions. Are the adjusted firms a mathematical projection or do they constitute a list of real firms? If a firm did not respond to the telephone survey, was it still considered available? If a surveyed firm said it was not interested in MDT work, was it dropped from the adjusted list? If a firm indicated that it bid 20 times, was it counted as equally available to firms that bid only one? Were firms that bid only on contracts worth $50,000 or less counted as equally available to firms that bid multi-million dollar contracts? Good social science requires answers to all these questions, but neither the text of the study nor depositions with Ms. Kyle and Mr. Ling could provide answers. P.30.

- The Wilson study violates one of the first rules of social science that statistical calculations should be transparent and replicable.[3] P.46.

---

[3] See for example, American Educational Research Association, "Standards for Reporting Empirical Social Science Research in AERA Publications." *Educational Researcher,* Vol. 35, No.6, pp, 33-40. "Two overarching principles underlie the development of these reporting standards; the sufficiency of the warrants [adequate evidence to justify results and conclusions] and the transparency of the report." (p.33).

- Neither the Wilson researchers nor the State has verified any of the anecdotal allegations made in the study. (Kyle, p.72-73 and Ling, p.71). In its April 11, 2014 admissions, the state admitted that it did know which firms provided the anecdotes in the Wilson study (MWHC Ex. 122 RTA 20). Neither the Wilson group nor the State saw any of the actual interview responses summarized in the study. (MWHC Ex. 122 RTA 24, 23). The State has never been provided with the transcripts of any interviews reported in the study (MWHC Ex. 122 RTA 24) and did not verify any of the anecdotal claims in the Wilson study to know whether they are accurate and true. (MWHC Ex. 122 RTA 21). No claim was ever investigated; even the four interviewees that stated MDT discriminated against them. P.63.

45. In summary, the anecdotal section of the Wilson study does not meet social science research standards and it is not helpful in documenting actual instances of discrimination or devising remedies.

46. The assertions of Dr. LaNoue that the Wilson study did not meet acceptable social science standards remains undisputed. The Wilson study does not meet the *Daubert* requirements.

47. The Wilson Study cannot be tested or replicated.

48. *Daubert* suggests the court consider "whether a theory or technique can be

tested." 509 U.S. at 592-94. Here because of the deficiencies noted above,

the Wilson report cannot be tested or replicated. As Dr. Lanoue wrote in his

report:

Dr. Ling did not write the availability chapter as Ms. Kyle claimed. Nor could he answer many of the questions about the availability calculations, she said he would have responsibility for. Good social science requires researchers to understand their data sources and the methods used to statistically analyze it. Without that information, it is not possible for anyone else to replicate a study's conclusions or determine its accuracy.

p.29

First, it has to determine availability by distinguishing qualified, willing and able firms from those that are not and then weigh those relative characteristics for the firms considered minimally available. If that is not done, there is no way to determine whether a disparity is caused by differences in the qualifications, willingness and ability of firms belonging to certain groups or to racial and gender discrimination. A firm might be very willing, but not have the qualifications or ability to perform of the MDT contracts being awarded. According to the text of the Wilson study, it may have attempted to do that, but neither the text Ms. Kyle or Mr. Ling could explain how it was done. There is no way to scientifically replicate or determine the accuracy of the study's calculations.

P.78-79

49. As Dr. Lanoue testified in his deposition:

Q: So you did not attempt to replicate the D. Wilson methodology…

A. I don't know how anyone could since the methodology is not clear.

LaNoue 65:13-16

50. That testimony and report by Dr. Lanoue remains undisputed and

unchallenged.

51. The Court finds the D. Wilson study and testimony regarding the study is inadmissible.

52. It is clear and undisputed that both *Western States* and the USDOT guidance memorandum require the state to account for factors other than race in determining availability. Those factors will include size, capacity, experience, financing, and location **to determine** those who are "ready, willing, and able".

53. The evidence shows that neither the Wilson study nor the state using the DBE suite controlled for such factors. As such, the State's availability determinations are false, unreliable and inflate the availability.

54. The stated reason for MDT's imposition of race based preferences was that the DBE utilization was declining. However, the state conceded that it had no evidence the decrease was the result of discrimination. (Dep. Stewart).

55. The State ignored the guidance of Western States and the USDOT memorandum which provided:

a decline in DBE participation after race- and gender- based preferences are halted is not necessarily evidence of discrimination against DBEs. *See* 407 F.3d at 999 ("If [minority groups have not suffered from discrimination], then the DBE program provides minorities who have not encountered discriminatory barriers with an unconstitutional competitive advantage at the expense of both non-minorities and any minority groups that have actually been targeted for discrimination."); *id.* at 1001 ("The disparity between the

proportion of DBE performance on contracts that include affirmative action components and on those without such provisions does not provide any evidence of discrimination against DBEs."); *see also* U.S. Dep't of Transp., Western States Paving Co. Case Q&A (Dec. 16, 2014) ("In calculating availability of DBEs, [a state's] study should not rely on numbers that may have been inflated by race-conscious programs that may not have been narrowly tailored.").

Ex. 58

56. The testimony of Ms. Kyle regarding the availability analysis in the D. Wilson Study is not admissible.

57. Fed. R. Evid. 602 provides:

 A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence may consist of the witness own testimony. This rule does not apply to a witness expert testimony under Rule 703.

58. Here MDT called Ms. Deidra Kyle of the D. Wilson Consulting Group to testify about the disparity study. Ms. Kyle was not designated by MDT as an expert witness and as a result her testimony is governed by Rule 602 which requires personal knowledge.

59. The Wilson disparity study includes a Chapter 4 in which "availability" of DBEs is determined. In deposition testimony Ms. Kyle testified that she did not determine availability, that determination was subcontracted to Mr. Ling of Evergreen Consulting.

60. Ms. Kyle had no knowledge of availability and continually deferred the questions to Mr. Ling.

61. Having no personal knowledge, Ms. Kyle is not competent to testify regarding the availability analysis.

62. If the MDT establishes the existence of discrimination in the state highway construction industry the (which it cannot do) MDT must still demonstrate that it has satisfied "narrow tailoring," that it is using race in the most limited manner that will still allow it to accomplish its objective. *Parents Involved in Cmty. Schools v. Seattle School District No. 1*, 551 U.S. 701, 720 (2007). "Even in the limited circumstance when drawing racial distinctions is permissible…[the recipient] is still constrained in how it may pursue that end." *Grutter*, 539 U.S. at 333. The court must be ultimately satisfied that no workable race neutral alternatives would suffice. *Fisher v. University of Texas*, 133 S.Ct. 2411, 2420 (2013).

63. Six factors are considered in the narrow tailoring analysis: (1) the necessity of relief; (2) the efficacy of alternative, race-neutral remedies; (3) the flexibility of relief, including the availability of waiver provisions; (4) the relationship of the stated numerical goals to the relevant labor market; (5) the impact of relief on the rights of third parties; and (6) the overinclusiveness of the or underinclusiveness of the racial classification. *United States v. Paradise*, 480 U.S. at 149, 171 (1987); *Croson*, 488 U.S. at 506; *Adarand*, 515 U.S. at 238-39 (noting that the lower court on remand

should consider whether the legislative body had tried race-neutral alternatives and whether the program was limited in duration.

64. Again, the burden to justify the use of racial preferences is "entirely" on the state and the state must demonstrate that each of the six factors were met **before** racial preferences were imposed.

65. MWHC suffered damages in the amount of $403,380.20 as a result of the MDT's implementation and administration of the improper DBE program.

66. The Supreme Court has ruled that monetary damages are an available remedy in private actions brought to enforce Title VI. *Franklin v. Gwinnett*, 503 U.S. at 60, 72-73 (1990); *Consolidated Rail v. Darrone*, 465 U.S. 624, 630-31 (1984).

67. *WH Scott Construction Co. v. City of Jackson*, 199 F.3d 206, 219-20 (5th Cir. 1999) involved a challenge to a municipal minority business enterprise program. The Fifth Circuit affirmed an award by the district court for lost profits to a non-minority contractor because the contractors bid had been "rejected for failure to comply with" the program.

68. Similarly, in *Chalmers v. City of Los Angeles*, 762 F.2d 753, 759-60 (9th Cir. 1985) a street vendor was prevented from conducting business due to conflicting ordinances which denied her due process.

69. The Ninth Circuit held that to make the vendor whole compensatory damages could be based on the vendor's initial set up costs plus net profits. A defendant whose wrongful conduct has rendered difficult the determination of precise damages suffered by the plaintiff is not entitled to complain that damages cannot be measured with exactness and precision. *DSPT v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010).

70. The Montana courts have held that exact proof of damage is not necessary. *Matelich v. Goodfellow Brothers*, 198 Mont. 150, 153 (1982).

71. There must be some evidence from which the amount may be determined. *McFarland v. Welch*, 48 Mont. 196, 198 (1913).

72. Expert testimony is not required to prove lost profits. *Lee v. Kanz*, 270 Mont. 505, 510 (1995).

73. The Montana Supreme Court has set forth the following standards for determining damages:

> Damages for loss of profits may be awarded if not speculative. The rule that prohibits speculative profits does not apply to uncertainty as to the amount of such profits but to uncertainty or speculation as to whether the loss of profits is the result of the wrong and whether such profit would have been derived at all. Once liability is shown, that is the certainty that the damages are caused by the breach, then loss of profits on a reasonable basis for computation and the best evidence available under the circumstances will support a reasonably close estimate of the loss…

> *Sebena v. AAA*, 280 Mont. 305, 310 (1996)

74. "Mathematical precision" is not required…proof of damages must consist of a reasonable basis for computation and the best evidence under the circumstances which will enable a judge to arrive at a reasonably close estimate of the loss. *Tractor & Equip. Co. v. Zerbe Bros.*, 348 Mont. 30, 41 (2008) quoting in Re *Mease,* 320 Mont. 229 (2004).

75. MWHC is entitled to damages in the amount of $403,380.20 as a result of the State's improper utilization and administration of its DBE program.  MWCH is also entitled to its costs and attorneys' fees concerning this litigation.  The Court will conduct a hearing on costs and attorneys' fees to the extent the parties are unable to stipulate to an amount.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED this _____ day of _____, 2018.


_____
Dana L. Christensen, Chief District Judge
United States District Court